NEWBOLD T. LAWRENCE et al., Respondents, *v.* THE TOWN OF HEMPSTEAD, Appellant.

1. TOWN OF HEMPSTEAD — TITLE TO TERRITORY. The ownership of the territory of the town of Hempstead, under the colonial grant, was in the town, in its corporate capacity, and not in the patentees named in the grant, nor in the inhabitants of the town.

2. EARLY MODE OF DIVISION. The early mode of division, by the town of Hempstead, of its common lands among the patentees, or their associates or successors, by a "fencing order," when duly made at a town meeting, could operate as a valid source of title.

3. ANCIENT TITLES OF COMMUNITIES. It is too late, after the lapse of 250 years, to criticise, on account of the absence of legal forms, transfers on which the titles of great communities are based.

4. PRESUMPTION AS TO OWNERSHIP. In the judicial investigation of titles derivable from the informal procedure of communities, in their infancy, presumptions should be allowed to militate in favor of whomever the conclusion favors as the true owner.

5. MARSH AND BEACH — PRIVATE OWNERSHIP. In an action against the town of Hempstead, to restrain it from interfering with a tract of salt

meadow, or marsh and beach, at Rockaway, forming the extreme westerly portion of the township of Hempstead and the easterly part of Rockaway Neck, the plaintiffs, in proof of their claim of title, relied upon a fencing order made at town meeting in 1659, an allotment in 1678, a deed by the allottees to Jacob Hicks in 1725, confirmatory action at subsequent town meetings, and a partition suit between the Hicks heirs.   The town insisted that the property was part of its common land, of which it had never become divested.   *Held*, that while the informalities of the allotments, the scantiness of the records and the shifting nature of the landmarks tended to confusion and uncertainty, the facts, beginning with the fencing order as the source of title to private ownership, led to the reasonable conclusion that the town had disposed of the premises, and that its allottees granted them by the deed of 1725; that the plaintiffs had made out a presumptive title, and that the town had failed to rebut the presumption and to show that, in its general division and allotments of the common lands it had reserved any part of the Rockaway meadow lands from private ownership.

6. POSSESSION — ACTS OF OWNERSHIP.   It was insisted by the town that the plaintiffs never were in possession of, nor ever exercised acts of ownership over, the meadow lands, while the town continually asserted ownership and, so far as possible, was in possession thereof.   It was found that the lands were incapable of actual possession, and it appeared that they could be reached only by a private lane over the Hicks upland, on which toll was charged, or by boats; that the property had been surveyed by one of the Hicks heirs in 1802; that the townspeople, from early in this century, had gone upon the marshes to cut sedge grass, upon days fixed by town meetings, and that within recent years the town had granted privileges to erect hotels, restaurants and bathing houses on the premises, and licenses to plant oysters in the creeks and coves.   *Held*, that, in view of all the circumstances, including the affirmative act of ownership by surveying the property in 1802, and the probability that the premises did not represent much value until the new uses to which the town had sought to put them, the quiescence of the Hicks heirs and of the plaintiffs, while owners of the upland, was not incompatible with private ownership of the meadow lands.

*Lawrence* v. *Town of Hempstead,* 83 Hun, 614, affirmed.

(Argued February 2, 1898; decided March 8, 1898.)   .

APPEAL from a judgment of the late General Term of the Supreme Court in the second judicial department, entered December 19, 1894, upon an order reversing a judgment in favor of defendants entered upon a decision of the court on trial at Special Term, and granting a new trial.

This action was brought to quiet the title to certain marsh

lands at Rockaway, in the town of Hempstead, Queens county, and the specific relief sought was an injunction to restrain acts of ownership by the town.

The facts, so far as material, are stated in the opinion.

*Augustus N. Weller* for appellant.   The resolution is not a grant, nor does it pretend or purport to be a grant of the premises or of any premises to any individual person or persons, either jointly or collectively.   (*Sanger* v. *Merritt*, 120 N. Y. 109; 131 N. Y. 614.)   Under a grant, so indefinite and uncertain as to the location of the territory granted, the plaintiffs cannot claim that their title is founded upon a written instrument.   (54 N. Y. 377.)   The quitclaim deed signed by fifty-eight men, the second link in the chain of plaintiffs' title, is equally defective and inoperative as a grant or conveyance of the *locus in quo.*   (*Coleman* v. *M. B. I. Co.*, 94 N. Y. 232; Willard on Real Estate, 404; *Jackson* v. *Rosevelt*, 13 Johns. 97; *Jackson* v. *DeLancy*, 13 Johns. 537; *Mason* v. *White*, 11 Barb. 184; *Peck* v. *Mallams*, 10 N. Y. 509; *Wheeler* v. *Spinola*, 54 N. Y. 377.)

*John E. Parsons* and *Eugene F. Daly* for respondents. Judge CULLEN's decision, acquiesced in by the General Term, that a fencing order and allotment, which are the source of all titles in Hempstead and in most of the Long Island towns, make a good title as against the town, is not erroneous.   (*Sanger* v. *Merritt*, 120 N. Y. 109.)

GRAY, J.   This action involves the title to a tract of land in the town of Hempstead, county of Queens, on Long Island; the plaintiffs' claim of ownership being resisted by the defendant upon the ground, substantially, that the property was a part of its common lands, of which it had never become divested.   No question has been raised therein, except that which relates to the sufficiency of the proofs to establish the plaintiffs' claim to the possession of the premises as against the defendant.   None of the important facts are in dispute

and the determination of the controversy depends upon the correctness of the legal conclusion which is deducible therefrom.

The plaintiffs acquired the premises by purchase, at a sale in 1878, had in a partition suit between the heirs of Jacob Hicks; to whom they had been deeded in 1725. At the Special Term of the Supreme Court the decision was against the plaintiffs; but, at the General Term, that decision was reversed, upon both the law and the facts, and the plaintiffs were adjudged to be entitled to the relief sought.

The premises comprise some 1,500 acres of salt meadow, or marsh, land and beach at Rockaway; the extreme westerly portion of the township of Hempstead, which is bounded by the waters of Hempstead bay to the eastward; by the ocean to the southward and to the northward by a line drawn from the nearest point of the waters of Hempstead bay to the waters of Jamaica bay By a survey made in 1802, the premises are shown to consist of salt meadow, marsh and beach; bounded on the south by the ocean, on the east by Hempstead bay, on the north, in part, by a channel opening into the bay, known as Crooked Creek, and on the west, in part, by upland and, in part, by what is known as "Wells' ("Whelses") line," that being a north and south line, drawn by a colonial surveyor. They form the easterly part of Rockaway Neck. Originally, the defendant received its territory by patent, in 1644, from William Kiefft, the Dutch governor of New Netherlands, and was, subsequently, confirmed in the grant by patent from the English governor, Thomas Dongan, in 1685. The ownership of the town lands was in the town, in its corporate capacity, and not in the patentees named in the grant, nor in the inhabitants of the town. (*Denton* v. *Jackson*, 2 John. Ch. 320.) It was its policy, from the earliest times, to divide its common lands among the patentees, or their associates, or successors, and such dispositions were made at regular town meetings. Its jurisdiction, in that respect, was characterized in *Denton* v. *Jackson*, as "steady, exclusive and unquestionable." The mode of the exercise of that jurisdiction, in earlier times, was by a "fencing order," which is

defined to be an order "directing a certain locality to be fenced with gates, or panels of fence; meaning thereby divisions so as to determine the particular area which was to go to each individual." The division to individuals was according to the number of gates or panels specified. That such a fencing order, when duly made at a town meeting, might have operated as a valid source of title, the appellant concedes. It was not until 1787 that, by enactment in that year, (Chap. 44, sec. 9), greater formalities were made requisite in the execution of conveyances of estates, other than at will. The informalities in the early allotments of the common lands of the town invest this case with obvious difficulties, in the attempt to discover where lies the title in dispute; but the learned justices, who wrote at the Special and General Terms, expressly concur in the view that "it is now too late, after the lapse of 250 years, to criticise, on account of the absence of legal forms, transfers on which the titles of great communities are based." That such a view is as correct as it is just, admits, in my opinion, of no reasonable difference in opinion and in the judicial investigation of titles, derivable from the informal procedure of communities, in their infancy, presumptions should be allowed to militate in favor of whomever the conclusion favors as the true owner; as it was conceded, in effect, by the learned trial justice. Where Mr. Justice CULLEN, however, disagreed with the contention of the plaintiffs was in an inability to find that the fencing order, relied upon as an original basis of title, included more than the upland; or that the town had ever conveyed away marshes or beaches, or meadows, with the upland. He expressly finds, also, not only that there never was any grant of the premises to the plaintiffs' predecessors in interest, but that the defendant has always been in possession, so far as possession was possible. At the General Term, it was reasoned, in the prevailing opinion, that the evidence of the town records showed allotments, or grants, of the meadow lands, as well as of the uplands, and, while the evidence failed to show a fencing of these marsh, or meadow, lands, that the allotment was the main thing and the

fencing was only intended to define the boundaries, where it was necessary and possible.

What the plaintiffs rely upon in proof of their chain of title are, *first*, a fencing order made in 1659; *second*, an allotment in 1678; *third*, a deed by the allottees to Captain Jacob Hicks in 1725; *fourth*, confirmatory action at subsequent town meetings and, *fifth*, a partition suit between the Hicks heirs; whereby such title as Hicks may have had in the premises became transferred to the plaintiffs.

The point to reach in our consideration is, whether the town's title appears to have been extinguished; because if that does appear the presumptions are all with the plaintiffs. The fencing order of April 17th, 1659, was made at a town meeting and provided that 47 persons named were "to fence and inclose Rockaway with the number of their gates." In May following, there is a record, which refers to the former order for the inclosure of the town lands at Rockaway for pasturage of cattle and horses and provides penalties against persons not complying. In May, 1669, by another order, three persons were to view the common meadows at the south and "to bring in the number of acres of good meadows" and "to lay the common meadows into particular allotments." In the following month, it was ordered that "they shall lay out the meadows to the uttermost bounds of Hempstead, bounds established etc." In 1676, it was "agreed by the major vote of the town that all the common meadow in the bounds of the town shall be laid out into allotments to every man according to his right; cow meadow excepted," and three persons were "chosen to lay out the common meadow and to lay out what upland is fit to be laid out." Finally, in 1678, it was "agreed by the major vote of the town," among other things, "that the layers out of the meadow shall require to lay out first at the easternmost common meadow on the south side of Rockaway," and the "lots drawn for meadow at Rockaway," with the names of forty-one persons, were specified. The "layers out" of the common meadow, referred to here, had been chosen at a meeting in February, 1677. Now Rockaway, as the fact was found

by the trial court, formed one of the South Necks of the town of Hempstead and the property in question was the "salt meadow, or marsh and beach, which constituted the easterly part of Rockaway Neck." The term "marsh," as a modern word, and the equivalent to meadow, does not appear to have been used in the earlier records of the town, or in grants.

It seems to me that these town records of proceedings not only evidenced the inclosure of Rockaway Neck in 1659 and an allotment in 1678 of the meadow lands, which comprehend the premises; but they evidence, as well, an intention to allot generally the common meadow lands of the town. The fact is also found, that there is no other record of an allotment of the Rockaway meadow land.

In June, 1725, a deed was executed to Captain Jacob Hicks, giving and granting to him all the rights, titles, interests, part or share of the signers, "belonging to a beach lying on the south side of the island, in the bounds of Hempstead aforesaid, at a place called Rockaway, bounded as follows: West by Whelses (Wells') line, south by the sea, east by Brockleface Gut and north by the Great Crick, together with all ye marshes and other privileges thereunto belonging, or in anywise appertaining, to him ye said Jacob Hicks, his heirs and assigns forever." This deed was signed by 59 persons; who, upon the evidence, as it was found below, were presumably the successors in interest of the allottees of 1678, and in some cases they correspond in name with some of those allottees. They were all men of more or less prominence in the town, as the evidence shows, and six of them were of the seven commissioners selected in 1723 to divide the common lands of the town. As to the west boundary "Whelses (or Wells') line," and the south boundary, the ocean, there arises no difficulty; but as to the east and north boundaries, it is argued that "Brockleface Gut" and the "Great Creek" cannot be fixed and ascertained. I think the plaintiffs are right, however, in saying that it is not material that their location has become somewhat difficult; for, with the westerly and southerly boundaries ascertained, the easterly and northerly boundaries may fix themselves, by tak-

ing any creek to the north and any "gut" (or inlet), to the east. But we are somewhat aided by other facts. Stephen Hicks, a grandson, in 1802 and 1803, had surveys made of the Hicks lands. The premises in question were surveyed in 1802 and the upland in 1803, and the westerly line of the former coincided with the easterly line of the latter. The Hicks upland became known as "Hicks' Neck," (now Lawrence Neck), and is bounded on the east by the meadow land in question. The finding below is that the property described in the deed of 1725 corresponded, substantially, with the property embraced in the survey of 1802, which was made for Hicks.

The suggestion of the appellant that this deed of 1725 may have been made under a mistaken supposition that the grantors owned the soil, as the original proprietors under the patent, has little plausibility. The town records show, pretty conclusively, that the allotments had already been made by the town of the South Necks, of which Rockaway was one. As the respondents' counsel observe, it is unreasonable to believe that six of the leading townsmen, who, as commissioners, were engaged in the division of the common lands under the town's order, under its claim of ownership, should unite in a deed as freeholders only, in opposition to the claims of the town and in violation of their trust.

There appears to have been such confirmatory action on the part of the town, at certain town meetings, as to render it quite certain that it had disposed of its common lands upon the South Necks; of which, as mentioned, Rockaway, including the land in question, was one. From 1723 down to 1749 and 1750, and while Hicks was in possession under his deed, the subject of its remaining, undivided, lands was under consideration by the town and the South Necks were expressly excepted, as having been already disposed of; or they were ordered "to be and remain as they were laid out."

It is insisted by the defendant, and the learned trial judge agreed with its contention, that the plaintiffs never were in possession of, nor ever exercised acts of ownership over

the premises; while the town continually asserted ownership and, so far as possible, was in possession thereof. I do not think there is much difficulty in meeting this point. The fact, as found, was that these lands were incapable of actual posssession. So far as the Hicks were concerned, the lands could only be reached by a private lane, leading from the highway southerly over the Hicks' upland, or neck, to the ocean and from its southerly extremity teams, vehicles and cattle would pass to and from the meadow land in controversy. Of course, the lands could be reached by boats. For an affirmative act of ownership, we have the careful survey of the property, made by the direction of Stephen Hicks, in 1802. As to the town, it appears that the townspeople, from an early date in this century, appear to have gone upon the meadow lands, or marshes, to cut the sedge grass, upon days fixed by town meetings. If we assume that the town orders did refer to the premises in dispute, which is not quite certain as a fact, the public entered upon them by way of the private lane over Hicks' Neck, for the use of which a toll was imposed; or by boats. Privileges, within recent years, were granted by the town to erect hotels, restaurants and bathing houses and, also, licenses to plant oysters in the creeks and coves. With the discovery of the uses of sedge grass and the possibilities of deriving a revenue from granting beach and water privileges, the ownership and control of this tract became desirable. But, if the town had dispossessed itself, in former years, of its ownership and the property had come into that of Jacob Hicks by the deed of 1725, and the title had remained in him and his successors in interest, how could such acts of the town and its inhabitants, however quiescent the Hicks family may have appeared, invalidate their title? The predecessors in interest of the plaintiffs were not bound to bring suits for the protection of their lands against trespassers. Of course, the appellant means no such thing; but what is meant is that, with the title in doubt, such evidence would have a bearing upon the conclusion to be reached upon the facts.

I do not underestimate the difficulties of this case and I recognize that it is not easy to answer all the objections that can be raised. The informalities of the allotments, the scantiness of the records and the shifting nature of the landmarks, descriptive of such localities, tend to confusion and to uncertainty, undoubtedly; but the facts, when summed up, point, in my opinion, only to the one reasonable conclusion, that the defendant had disposed of the premises in controversy and that its allottees granted them, by the deed of 1725, to Jacob Hicks.

By the fencing order of 1659, Rockaway Neck was inclosed, and it was, unquestionably, the source of title to the private ownership of the lands comprehended therein. Subsequent proceedings at the town meetings showed that the subject of the allotment of the common meadows within the bounds of the town, as well as of the uplands, was acted upon; until, in 1678, we find the easternmost common meadow, on the south side of Rockaway, allotted to the 41 persons according to their drawings. There is no other allotment of record of this meadow and there is nothing to militate against the continued ownership of the allottees, until, in 1725, they, and those who were successors in interest, united in the conveyance to Hicks. Before and since the conveyance to Hicks, the town appears to have recognized a private ownership and, for that reason, to have excepted these lands in its division of its common lands.

There are certain conveyances of record, which make it pretty clear that the fencing order of 1659 and the allotment proceedings of 1678 included the salt meadows adjoining the Rockaway neck of upland. The tract conveyed by the deed of 1725 seems to have been kept undivided by the allottees. If it was held in a common ownership, I am not able to see how that fact could impair the conclusion that title had been acquired, was retained and was transferred. It was altogether probable that Jacob Hicks should have desired to acquire the title to the meadow, or marsh land, which adjoined his upland, and which communicated by his private lane with the highway. While the premises, from their very situation, repre-

sented a certain value to him; from their nature, they could not have represented much value to his heirs; who, probably, viewed with indifference, or in possible ignorance of their rights, the acts of their townspeople in cutting the sedge grass. But, with the new uses to which the defendant has sought to put them, it can be readily seen that the importance of an exclusive ownership would suggest itself to the plaintiffs and cause them to apply for the aid of the court, to restrain the defendant from interference in the ways described. I have reached the conclusion that the plaintiffs have successfully supported the burden of proof, so far as to make out a presumptive title in them, and that the defendant has failed to rebut the presumptions, and to show that, in its general division and allotments of the common lands, it had reserved any part of the Rockaway neck or meadow lands from private ownership.

I, therefore, must advise an affirmance of the judgment; but, under the circumstances, I should suggest, without costs against the defendant.

BARTLETT, J. (dissenting). I do not think the plaintiffs have sustained the burden of proof resting upon them.

They were obliged to show by a preponderance of evidence that the original title of the town of Hempstead to the premises in question was vested in them. There is much in this evidence concerning which speculations may be indulged, and upon which theories more or less persuasive could be founded, but there is no such clearness of proof as to establish a title to the property even under the lax forms of conveyance common in the town of Hempstead in the seventeenth century. It is clearly established by the defendant that it has for one hundred years and more exercised acts of dominion over the marshes, beaches and meadows comprising the common property of the town lying between the ocean and the premises of the upland proprietors. These acts, in so far as they affect the property in question, are hostile to and inconsistent with the plaintiffs' claim.

The trial court found that neither the plaintiffs nor their grantors were ever in possession of the premises except that about 1803 one Stephen Hicks, an ancestor of some of the plaintiffs' grantors, caused the premises to be surveyed, and about 1875 some of the descendants of said Stephen Hicks laid claim to the same and attempted to partition them among themselves, and under this partition suit a sale was made to plaintiffs' ancestors in the year 1878.

The General Term, in reversing the judgment of the Special Term in favor of defendant, was divided, and the learned judge who wrote the prevailing opinion states that he reached his conclusion with " great hesitation."

The judgment of the General Term should be reversed and the judgment of the Special Term affirmed, with costs to the defendant in all the courts.

GRAY, J., reads for affirmance; PARKER, Ch. J., O'BRIEN, HAIGHT and VANN, JJ., concur; BARTLETT, J., reads for reversal, and MARTIN, J., concurs.

Judgment affirmed, and judgment absolute ordered for the plaintiffs on the stipulation, but, under the circumstances, without costs.