RICHARD SANDIFORD, Appellant, *v.* THE TOWN OF HEMPSTEAD, Respondent, Impleaded with CARMAN FROST and AMANDA FROST, Appellants.

*Hempstead bay and the Post Lead tract — title thereto — general and particular description in a deed — a partition suit is a proceeding in rem — a judgment when not conclusive in another action.*

In an action in which the plaintiff and a defendant, Carman Frost, claimed to be the owners of practically all of Hempstead bay from the Oyster bay line to a line about 7,000 feet east of the western boundary line of the town of Hemp-

stead, and also of a tract of land known as Post Lead, which is located in Hempstead bay between the western boundary line of the town of Hempstead and the western boundary line of the first-mentioned tract, it appeared that the plaintiff's title was founded upon a deed to one Hicks dated June 7, 1725, which purports to convey all the "right, title, interest, part or share" of the grantors "belonging to a beach lying on ye south side of ye island in ye bounds of Hempstead aforesd att a place called Rockaway, bounded * * * west by Whelses (Wells') Line, south by the sea, east by Brockelface Gutt and north by ye Great Creek, togather with all ye marshes and other priviledges thereunto belonging or in any wise appertaining;" that in 1802 one Fosdick, at the request of parties claiming under the Hicks deed, made a survey and map of a tract of 1,504¼ acres of land on the west side of the town, which was bounded on the west by Wells' line, on the south by the sea, on the east by East Rockaway inlet and on the north by Great creek.

In 1878 an action to partition the premises was commenced, the complaint in which action described the property sought to be partitioned as it was described in the deed executed to Hicks in 1725 and also "more particularly as follows:" Then followed the description of the Fosdick survey of 1802 giving the name of the inlet on the east as "Hog Island or East Rockaway Inlet and formerly (known) as Brockleface Gut." The north boundary was given as Great creek and the southwesterly boundary as Brower's bay and Crooked creek.

The complaint also alleged that the parties owned no other land in common and this allegation was not denied. The land was conveyed to the purchaser at the partition sale by the same description as that contained in the complaint and judgment.

Thereafter, one Lawrence and others, who had succeeded to the title of the purchaser at the partition sale, brought an action against the town of Hempstead to quiet the title to the property and to restrain the town from exercising acts of ownership over the same. The complaint in such action described the property as it was described in the partition action. The final judgment in that action adjudged the plaintiffs to be the owners and entitled to the possession of the premises described in the complaint, and the town was restrained from trespassing thereon or attempting to take possession thereof. The judgment contained the same description of the premises as was set forth in the complaint and judgment in the partition action.

November 21, 1887, prior to the commencement of the action against the town, the said Lawrence and the other owners conveyed to Carman Frost the property called Post Lead. On July 15, 1889, during the pendency of the action against the town, the same parties executed and delivered to Carman Frost, who was a party to the action, a deed which purported to convey the premises which comprise all of Hempstead bay from the eastern boundary line of the town to a line 7,000 feet east of the western boundary.

December 6, 1894, the said Carman Frost conveyed to the plaintiff in the present action a one-third interest in the premises which had been conveyed to him by the two last-mentioned deeds.

The plaintiff's main claim was, that Brockleface gut, which was the easterly boundary of the property conveyed to Hicks in 1725, is not identical with East

Rockaway inlet as shown upon Fosdick's survey, but was an inlet near the boundary line between Hempstead and Oyster bay, and that the property conveyed to Jacob Hicks was not only the 1,504¼ acres surveyed by Fosdick, but included all the lands, salt marshes and beaches within Hempstead bay to the Oyster bay line.

*Held,* that the plaintiff had failed to establish his claim;

That, even if the plaintiff's claim was in fact correct, the effect of the "more particular" description in the complaint in the partition action was to limit the jurisdiction of the court to the property therein described, particularly as the allegation of the complaint that the parties owned no other premises in common was not denied;

That a suit in partition is a proceeding *in rem* and that the jurisdiction of the court is confined to the property described in the complaint;

That, assuming that the parties to the partition action owned to the Oyster bay line, there was no provision of law which prevented them from maintaining an action to partition a portion of the land;

That, at the date of the Hicks deed, Rockaway was a term which applied to one of the southern necks of the town of Hempstead and not to the whole of the southern necks of such town;

That the name Brockleface gut was not applied to any main inlet of the bay;

That the decision in the action brought by Lawrence against the town of Hempstead was not controlling in the present action upon the question of the location of Brockleface gut, for the reason that the situation of upland and salt marshes and beaches developed in *Lawrence* v. *Hempstead* was different from that developed in the present action;

That the plaintiff was not entitled, under the authority of *Lawrence* v. *Hempstead,* to a decree in his favor with respect to that portion of the premises in question (exclusive of the Post Lead tract), which was included in the description contained in the judgment rendered in the action of *Lawrence* v. *Hempstead ;*

That this portion of the premises other than the Post Lead tract having been purchased by the plaintiff and his grantor during the pendency of the action of *Lawrence* v. *Hempstead,* if there was any interference by the town with that portion of the property or any violation of the judgment rendered in *Lawrence* v. *Hempstead,* the plaintiff's remedy was by a proceeding to enforce such judgment;

That, as Lawrence had no interest in the Post Lead tract at the time he commenced his action against the town of Hempstead, this fact would be a good defense to any application by the plaintiff to enforce the judgment rendered in that action, so far as it affected the Post Lead property;

That the plaintiff was entitled, under the authority of *Lawrence* v. *Hempstead,* to a decree in his favor with respect to the Post Lead tract of the same character as that awarded in the *Lawrence* case.

APPEAL by the plaintiff, Richard Sandiford, from so much of an interlocutory judgment of the Supreme Court in favor of the plain-

tiff and the defendants Frost, entered in the office of the clerk of the county of. Queens on the 8th day of December, 1902, upon the report of a referee as adjudges that all of the property described in the complaint, except that particularly described in the first part of said judgment, in the words beginning with "All the right, title and interest of Newbold Lawrence at the time of his death of, in and to the meadow and marsh land, islands and land under water in the town of Hempstead, within the following boundaries," etc., belongs to and is in the possession of the town of Hempstead; and from so much of said judgment as limits the injunction and account of rents and the rights of the plaintiff and said defendants. Frost to an injunction and accounting in this action to the lands so described; and limits the accounting to the period subsequent to the 20th day of December, 1892, and by the defendants Carman Frost and Amanda Frost from the whole of said interlocutory judgment; also an appeal by the plaintiff, Richard Sandiford, from so much of the final judgment entered in the office of the clerk of the county of Queens on the 28th day of January, 1903, in favor of the plaintiff and the defendants Carman Frost and Amanda Frost against the town of Hempstead, as limits the injunction and relief granted and the rights of the plaintiff and the defendants Frost to the lands first and more particularly described in said judgment, and adjudges and decrees that the other lands in the amended complaint mentioned and described and east of Post Lead on the south side of the town of Hempstead belong to and are in possession of the town of Hempstead; from so much of the said judgment as adjudges that the defendant has duly accounted for the rents and profits of plaintiff's lands and limits the period of such account to and from December 19, 1892, and does not extend the account to ten years previous to the commencement of the action to the 19th day of December, 1888; also from so much of said judgment as adjudges that the plaintiff is not entitled to any relief in this action as to the small tract of land mentioned in the "Fourth" paragraph of said judgment, with notice of an intention to bring up for review upon said appeal the decision filed in the office of the clerk of the county of Queens herein on the 8th day of December, 1902, and the interlocutory judgment filed, entered and docketed in the office of the clerk of Queens county on the 8th day

of December, 1902, and the limitations thereof and of the injunction and relief thereby ordered and adjudged to the plaintiff, to lands first therein mentioned and described and bounded within the limits of the survey of Morris Fosdick of 1803, and plaintiff's exceptions to said decision and appeal from said judgment, and the limitations of the account therein ordered, as above mentioned in the final judgment, and each and every part thereof of said interlocutory judgment; also an appeal by the defendants Carman Frost and Amanda Frost from the final judgment of the Supreme Court, entered in the office of the clerk of the county of Queens on the 28th day of January, 1903, and from each and every part of said judgment.

*W. Martin Jones* and *W. F. Wyckoff*, for the appellants.

*Edward E. Sprague* and *Fred Ingraham*, for the respondent.

Judgment affirmed on the opinion of the referee, with costs.

All concurred, except HOOKER, J., who dissented.

The following is the opinion of the referee :

CHARLES F. BROWN, Referee :

The plaintiff and the defendant Carman Frost claim to be the owners of what is practically all of Hempstead bay from the Oyster bay line to a line about 7,000 feet east of the western boundary line of the town of Hempstead.

They also claim to own a tract of land of the same character known as Post Lead, which is located in Hempstead bay between the west boundary line of the town and the west boundary line of the first-mentioned tract.

The plaintiff's interest in the premises is an undivided one-third which he acquired by a deed from the defendants Frost in 1894.

Carman Frost claims to be the owner of the remaining two-thirds of the premises in controversy.

The property in controversy was originally a part of the common lands of the town of Hempstead.

It is the plaintiff's claim that the town's title was divested by certain allotments of the property among the original proprietors of the town by proceedings which will be hereinafter referred to.

The immediate foundation of the plaintiff's title is a deed signed by fifty-nine persons to Captain Jacob Hicks dated on June 7, 1725, which purports to convey all the "right, title, interest, part or share" of the grantors "belonging to a beach lying on ye south side of ye island in ye bounds of Hempstead aforesd att a place called Rockaway, bounded * * * west by Whelses (Wells') Line, south by the sea, east by Brockelface Gutt and north by ye Great Creek, togather with all ye marshes and other priviledges thereunto belonging or in any wise appertaining."

In 1802 Morris Fosdick, at the request of Stephen Hicks and Jacob Hicks, who had succeeded to the title conveyed by the deed aforesaid, made a survey and map of a tract of 1,504¼ acres of land on the west side of the town, which was bounded on the west by Wells' line, on the south by the sea, on the east by East Rockaway inlet and on the north by Great creek, which creek the witness Conklin identified as a creek now called Crooked creek, which runs from Brower's bay westerly along Wells' line.

In 1878 there was a partition action between the heirs of Hicks of the property conveyed to Jacob Hicks by the deed of 1725, which action was prosecuted to judgment and the property sold and conveyed by the referee to Alfred N. Lawrence. The defendant Carman Frost, who had acquired by various deeds the interests of certain of the Hicks heirs in the property, which amounted to more than one-third of the whole, was a defendant in that action.

In the complaint the property sought to be partitioned was described as it was in the deed to Hicks in 1725 and then "more particularly as follows." Then followed the description of the Fosdick survey of 1802 giving the name of the inlet on the east as "Hog Island or East Rockaway Inlet and formerly (known) as Brockleface Gut." The north boundary was given as Great creek and the southwesterly boundary as Brower's bay and Crooked creek.

It was also alleged in the complaint that the parties owned no other land in common, and the referee reported that "after a personal examination of the premises, which is all salt meadow land," an actual partition thereof could not be made.

The land was conveyed by the referee to Alfred N. Lawrence, the purchaser at the partition sale, by the same description as that contained in the complaint and judgment.

Alfred N. Lawrence conveyed the property to Newbold Lawrence, who died owning the same.

In November, 1888, Newbold T. Lawrence and others, who had succeeded to the title, commenced an action against the town of Hempstead to quiet the title to the property and to restrain the town from exercising acts of ownership therein.

In the complaint in that action the property was described as it was in the partition action.

By appeal this latter action was considered and determined at the General Term of the second department and by the Court of Appeals, and is reported in *Lawrence* v. *Town of Hempstead* (83 Hun, 614; affd., 155 N. Y. 297.)

By the final judgment in that action the plaintiffs were adjudged to be the owners and entitled to the possession of the premises described in the complaint, and the town was restrained from trespassing thereon or attempting to take possession thereof, and the judgment contains the same description of the premises as was set forth in the complaint and judgment in the partition action.

The foundation for the decision in the case of *Lawrence* v. *Town of Hempstead* (*supra*) was that the title of the town had been extinguished by the allotments of upland meadows to the grantors of Jacob Hicks or to their predecessors in title, and that the allotments thus referred to evidenced the intention of the town to transfer its title not only to the upland, but to the common meadow land as well, and that the latter term included the salt marshes and beaches.

The facts and proceedings referred to by the court at General Term and the Court of Appeals, and by which it was held that the town had parted with its title, were a fencing order of April 17, 1659, which provided that forty-seven persons named therein should fence Rockaway, and a resolution of the town meeting on December 25, 1678, which directed the laying out of the common meadows on the south side of Rockaway to forty-one persons named therein, and findings by the trial court that Rockaway was one of the south necks of the town and included the land in question, and was a name applied to that part of the town between Hempstead bay and Jamaica bay, and that the property in question constituted the easterly part of Rockaway neck and corresponded substantially

with the property described in Fosdick's survey, and was conveyed to Alfred N. Lawrence by the referee in the Hicks partition suit.

The referee's deed to Alfred N. Lawrence was dated May 6, 1878. The action of *Lawrence* v. *Town of Hempstead* (*supra*) was commenced in November, 1888, and final judgment was entered therein in March, 1898.

On November 21, 1887, Newbold T. Lawrence and others conveyed to the defendant Frost the property called Post Lead, and on July 15, 1889, the same persons executed and delivered to Frost a deed which purported to convey the premises heretofore referred to, which comprise all of the Hempstead bay from the eastern boundary line of the town to a line 7,000 feet east of the western boundary.

On December 6, 1894, Frost conveyed to the plaintiff a one-third interest in the premises conveyed to him by the last two deeds.

This brief statement of the history of prior litigations is essential to understand the claim of the plaintiff in this action.

The main claim of the plaintiff upon the facts is that Brockleface Gut, which was the easterly boundary of the property conveyed to Capt. Jacob Hicks in 1725, is not identical with East Rockaway inlet as shown upon Fosdick's survey, but was an inlet near the boundary line between Hempstead and Oyster bay, and that the property conveyed to Jacob Hicks was not only the 1,504¼ acres surveyed by Fosdick, but included all the lands, salt marshes and beaches within Hempstead bay to the Oyster bay line.

This conclusion he seeks to establish by proof of the following facts:

1. That Great creek (the northerly boundary in the Hicks deed) was at the easterly side of the town. (Proof of this fact is in the testimony of Conklin, who states that there is no Great creek west of the neck designated on Exhibit 58 as Hicks' neck, and which would be about midway between the Oyster bay line on the east and Wells' line on the west, and that the only Great creek that is within Hempstead bay runs south of all the necks of upland easterly to the Oyster bay line.)

(This opinion of Conklin [and it is only such] he has formed from an exhaustive examination of the records of the town and of old deeds and conveyances.)

2. That about the date of the deed to Hicks there was no inlet

between Wells' line and the Oyster bay line, and that the outer beach of that whole territory was solid.

(The proof of this fact is claimed to exist in old maps of the eighteenth century which show an inlet to Hempstead bay only near the Oyster bay line.)

3. That all the grantors of Jacob Hicks owned upland at the easterly side of the town and none of them owned land at the westerly side of the town where Fosdick made his survey.

(The proof of this fact is in the testimony of Conklin, who has plotted allotments of upland to the grantors of Hicks or to their predecessors in title which he has laid out on Exhibit 58.)

None of the allotments which Conklin has plotted are upon any neck of land west of what is designated on Exhibit 58 as Christian Hook, the westerly boundary of which is East Rockaway channel, and Conklin testified that none of the Hicks grantors owned property west of East Rockaway inlet which was the east line of the Fosdick survey and the east line of the property described in the partition action and in the complaint and judgment in *Lawrence* v. *Town of Hempstead* (*supra*).

Before discussing the testimony it is well to consider the sources of the plaintiff's title to the property in controversy.

Did the Lawrences have any title to the property outside of the Fosdick survey which they could and did convey to Frost, the plaintiff's grantor?

It is the contention of the learned counsel for the plaintiff and for the defendants Frost that the deed by the referee in the partition action conveyed to Lawrence all the property which Jacob Hicks acquired in 1725, and that, if Brockleface Gut was in fact located in 1725 near the Oyster bay line, that the referee's deed conveyed to Lawrence all the property to that point.

To this claim I do not assent.

The effect of the " more particular " description in the complaint in the partition action was to limit the jurisdiction of the court to the property therein described.

The plaintiffs alleged in substance that East Rockaway inlet, as located by Fosdick in 1802, was identical with Brockleface Gut as it existed in 1725, and made East Rockaway inlet the eastern boundary of the property of which partition was sought.

A suit in partition is a proceeding *in rem*, and the jurisdiction of the court is confined to the property described in the complaint. (*Corwithe* v. *Griffing*, 21 Barb. 9, 14.)

Even assuming that the parties owned to the Oyster bay line, there was no provision of law which prevented them from maintaining an action for a partition of a part of the lands which they owned in common. (*Pritchard* v. *Dratt*, 32 Hun, 417.)

But it was alleged in the complaint in the partition action that the land described therein was the only property owned by the parties as tenants in common. No one, not even Frost, denied that allegation.

Testimony was taken by the referee and Frost was sworn as a witness and testified that he had examined the premises described in the complaint; that it consisted of land and beach and marsh, and that the tide overflowed it, and that there was 100 or 200 acres; that a survey had been made of it in 1802, and that the value was about $500.

Frost could not have had the whole of Hempstead bay, with its numerous islands, beaches and marshes, in his mind when he gave that testimony.

It is plain, I think, that the court had no jurisdiction to direct the sale of any land except that described in the more particular description in the complaint, and that the judgment was limited to that property.

Moreover, it is equally plain that Alfred N. Lawrence, and those who succeeded him, did not claim any property outside of the more particular description.

The suggestion of the learned counsel for the plaintiff that the Lawrences failed to insist upon all their rights in their action against the town, is shown to be without foundation by the findings of Mr. Justice CULLEN, already referred to, and which were made at the request of the Lawrences. The court found, at Lawrences' request, that the property corresponded substantially with the property described in the Fosdick survey and was conveyed to Alfred N. Lawrence by the referee in the Hicks partition action.

I am of the opinion, therefore, that the plaintiff has no right as a grantee of Lawrence which he can assert in this action except to Post Lead, which I will consider later on.

Carman Frost, however, who is the plaintiff's grantor, acquired prior to the partition action the rights of several of the Hicks heirs, and the plaintiff as grantee of Frost has acquired an undivided one-third of such rights.

Although I regard it very doubtful whether the present action can be maintained without making all the owners of the land parties, I shall assume for the purpose of disposing of the case that the action is properly brought and is maintainable.

The testimony fails to satisfy me of the location of Brockleface Gut in 1725.

It is essential to the plaintiff's recovery that he should locate that boundary with a fair degree of certainty. His predecessors in title have assumed a location for Brockleface Gut at a different place than that at which he now claims it was located, and have produced in other cases testimony which has satisfied the courts of the correctness of their contention.

It is impossible to decide this case without reference to the effect of the other decisions, especially as the defendant Frost was a party to the partition action, and those decisions will control the mind of any judge, unless the testimony introduced in this action compels the conclusion that the prior decisions were based on a mistaken view of the facts.

I fail to appreciate the force of the plaintiff's contention that Brockleface gut must have been at the east side of the town because Great creek was in that part of Hempstead bay.

Concededly the property conveyed to Jacob Hicks extended to the west line of the town; its northerly boundary was Great creek, and that creek bounded the property at Wells' line equally as at the east line. We should expect to find Great creek, therefore, at any point on the north line of the property whether the eastern boundary was the Oyster bay line or at East Rockaway inlet.

I cannot infer that Brockleface Gut was near the Oyster bay line because there was a Great creek there, because wherever Brockleface Gut was it was intersected by a creek at the north line of the property, which the parties call Great creek, and which concededly must have run west to Wells' line.

Neither do I regard the old maps as satisfactory evidence that there was solid beach in 1725 from Wells' line to a point near the

SECOND DEPARTMENT, JULY, 1904.        [Vol. 97.

Oyster bay line. Neither of the maps introduced in evidence purport to have been made from a survey of the beach, and unless made from a survey are worthless as testimony.

The earliest in date is at least fifty years later than Hicks' deed, and considering the changes that are constantly taking place in the beach and the shifting of the various inlets to the bay, it is evident that if we could assume that the maps correctly show the condition of the beach at their dates, they would be slight evidence of the condition of the beach or the location of the inlets at a period fifty years earlier.

Even Conklin, who is positive in his deductions from the records of the town, testifies that no one could tell the location of the inlets 200 years ago.

It is a fair presumption that the constant changing and shifting in the various inlets which the proof shows now goes on was going on in 1725; and if it was, it is impossible for any one to know at this day what inlets there were to the bay at the date of the Hicks deed, or where such inlets were situated.

The testimony of Langdon, who is a most competent witness, contradicts the theory that in 1725, or at any other time, there could have been solid beach from Wells' line to the Oyster bay line, except when East Rockaway inlet shifted to the west of Wells' line.

His testimony is that Hempstead bay is drained into the ocean by two main inlets, which substantially are represented by Jones' inlet on the east and East Rockaway inlet on the west. The tendency of these inlets is constantly to shift to the west, and this tendency is greater in East Rockaway inlet than it is in Jones' inlet. When the body of water in the bay, however, to the east of either inlet becomes so great that it breaks through anew to the east, the old inlet will fill up. This shifting of the inlet to the west and the breaking out at the old place cover a period of about forty years.

In addition to the main inlets to the bay there are now several others, and within the memory of witnesses there have been others which have closed up entirely.

Under such conditions it is impossible to locate the position of any inlet at a period beyond the memory of living witnesses, unless it can be done by accurate maps or by monuments upon the beach.

It is not probable that in 1725 there was any great interest in the exact condition or location of the inlets to Hempstead bay.

The first coast survey appears to have been made by the United States government about 1835. Prior to that time, in my judgment, maps are very slight evidence of the condition of the beach or the location of the inlets.

The other facts which are relied upon by the plaintiff are of greater weight; and if it be that the grantors of Jacob Hicks owned land only at the easterly necks of the town, it would be plausible to contend that the east boundary line must have been at or near that point.

Assuming, however, that Conklin has accurately plotted the allotments which he has investigated, the fact would still have to be explained why did the grantors of Jacob Hicks convey land to Wells' line?

The plaintiff refers to the fact that six of the grantors of Hicks were commissioners of the town selected in 1725 to divide the common lands of the town, and, as was said by Judge GRAY in the case of *Lawrence* v. *Town of Hempstead* (155 N. Y. 304), it is impossible to believe that they would have united in a deed in opposition to the claims of the town or in violation of their trust. But the inference of ownership of land near Wells' line is as strong from this fact as ownership at the Oyster bay line. Indeed, the remark was made by Judge GRAY with reference to ownership on Rockaway neck, where Conklin testified none of the Hicks grantors owned land.

Concededly the grantors of Hicks conveyed to Wells' line, and it is plain that they intended to convey a tract which began at Wells' line and extended to the east. From the fact alluded to they must have owned land at or near Wells' line. If they owned land in that part of the town, then Conklin must be mistaken in saying that none of them owned land west of East Rockaway inlet, and the argument based on the fact of sole ownership on the east side of the town amounts to nothing.

There is certainly nothing inconsistent in the Hicks grantors owning lands on both sides of the town, and I am not satisfied that they did not own on the west because Conklin says they did not.

I have already referred to the fact that the decision in the *Lawrence Case* (*supra*), was based on the fencing order of 1659 and the

division of meadows in 1678.    These orders are Exhibits 18 and 35 in this action.

In these documents we find nearly the same names as are found in the allotments of the easterly necks and many of them were apparently grantors of Jacob Hicks.

Richard Stitts, to whom and to whose allotment much attention has been given in the argument, is one of the allottees of Rockaway in the division of 1678, so that he must have had property both at the east and west sides of the town.

None of the allotments of 1678 are plotted and located by Conklin.    On Exhibit 58 his allotments appear to be based upon other and distinct orders and proceedings of the town and which related to parts of the town other than Rockaway, and were all made at different dates from those relating to Rockaway.

I admit an inability to be entirely certain about these various orders and allotments.    There is great uncertainty about the location of any of them, and I may only add to the confusion and uncertainty in attempting to state my own conclusions.

It is certain, however, that the decision in the *Lawrence Case* (*supra*) was based upon the fencing order of 1659 and the division of meadows in 1678.

In Mr. Justice PRATT's opinion at General Term, after referring to that order and the division of 1678, and the fact that in the deed to Jacob Hicks are found several of the family names and some of the full names of the persons who were officially connected with the allotment of December 25, 1678, it is said : " It is upon precisely this view that the legal title to the premises in question passed from the town to these allottees under the allotment of December 25, 1678, and from these* on through various mesne conveyances and the partition suit which appears in the case."

In Judge GRAY's opinion in the Court of Appeals he referred to the various proceedings of the town, and says (at p. 303): " It seems to me that these town records of proceedings not only evidenced the inclosure of Rockaway Neck in 1659 and an allotment in 1678 of the meadow lands which comprehend the premises, but they evidence as well an intention to allot generally the common meadow lands of the town."

---

* *Sic.*

If the court was right in its conclusion in the *Lawrence* case that the grantors of Hicks did own property within Fosdick's survey, then Conklin's conclusion is wrong.

It is the contention of the plaintiff, however, that " Rockaway " was a term which applied to the whole of the southerly necks of the town, and, therefore, the inclosure of Rockaway did not indicate an inclosure of what in the *Lawrence* case was called Rockaway neck.

While it may be that originally the name had such an application, I think that at the date of the Hicks deed it was used to designate one of the south necks of the town.   Its use in the proceedings of the town and in deeds and conveyances so indicate. For instance, the order of 1659 plainly did not apply to the whole water front of the town or intend that the whole of the town's water front should be fenced.   It plainly referred to some particular tract of land.

The order of May tenth of the same year indicates the purpose of the inclosure.

In the deed of Thomas Hicks to Jacob Hicks in 1699 the property conveyed is described as being on a certain neck called Long neck, situate on Rockaway, so called, on the south side of the island in the town of Hempstead.   This indicates that Rockaway was, as was found by Mr. Justice CULLEN in the *Lawrence* case, one of the south necks, and it is conceded by the learned counsel for the plaintiff in this action that Long neck is now called Lawrence's neck, and was the upland owned by Jacob Hicks.

It will be observed that the deed referred to was twenty-six years earlier than the deed to Jacob Hicks.

Other references of the same character can be found in other exhibits, and finally in the deed to Jacob Hicks in 1725, the property is described as on the south side of the island at a place called Rockaway.

The name has come down to the present time, and applies now, as was determined by Mr. Justice CULLEN, to the land between Hempstead and Jamaica bay.

I adhere to the opinion that was expressed in the *Lawrence* case that the fencing order of 1659 and the division of meadows of 1678 referred to Rockaway neck and included the land conveyed to

Jacob Hicks in 1725, and is described as accurately probably as it was possible to describe it in Fosdick's survey.

As I have already said, the place where these various allotments were located is involved in considerable uncertainty. Conklin's location is a matter of opinion only, deduced from an examination and study of the records of the town. While I admit the thoroughness of his examination and the force of his conclusions, his opinion that the grantors owned no property west of East Rockaway inlet is inconsistent with other important facts.

Why should the grantors of Hicks have conveyed to Wells' line if they owned no property on the westerly side of the town ?

Why should Hicks want a deed of beach and marshes adjoining his upland if he had no title thereto ?

Why should he have desired a conveyance of beaches and marshes a long distance from his upland and to which the only access would have been by boats ?

The nearer the testimony can approach the date of the deed to Hicks the more valuable it becomes. Stephen and Jacob Hicks must have known more of the location of the land than can be ascertained at the present time.

The survey of 1802, as Judge GRAY says in his opinion, was an act of ownership, and presumably Stephen and Jacob Hicks knew something about the easterly and northerly boundaries. So Mr. Fosdick, who was born in 1767, and who had been a surveyor all his life and lived in the vicinity, would probably have a recollection of landmarks and necks and inlets much earlier than the date of the survey. His son's testimony in the *Lawrence* case was that it was from his father's notes that he had first learned of the name Brockleface Gut. This survey having been made at the request of Stephen and Jacob Hicks by a local surveyer of repute is the most important piece of testimony in the case, and has been made the foundation of the claim to title by the Hicks heirs and their grantee Lawrence.

There is no proof that Capt. Jacob Hicks or any person who had any interest in the property ever made any claim of ownership outside of Fosdick's survey until it was made by Frost as the result of the investigation of the town records within the past few years. Again the conclusion that the grant was of a small tract is consistent with

the description of the property, viz., "a beach lying on ye south side of ye island   *   *   *   att a place called Rockaway." That is not such a description as would have been given of the whole of Hempstead bay.

If it had been the intention of the parties to the deeds to convey Hempstead bay, the description would probably have read: "all our right and title to the beaches lying on the south side of the island in the bounds of Hempstead, bounded west," etc. But the designation of the property as a "beach" and "att a place called Rockaway" indicates the description and location of a small tract of land.

Again, I am of the opinion that the name Brockleface Gut was not applied to any main inlet to the bay.

The researches of counsel have failed to find this name upon any map or in any record of the town, or in any conveyance except in the deed to Capt. Jacob Hicks. No living person ever heard of it. These facts, I think, indicate that it was applied to an unimportant inlet which probably was made by some of the changes and shifting in the beach, and existed but a brief time, and the name was forgotten when the inlet disappeared.

But whether the view of the facts which I have expressed be correct or not, I think the plaintiff must fail in this action for another and more important reason.

It is the contention of the plaintiff and of Carman Frost that the decision in *Lawrence* v. *Town of Hempstead* (*supra*) controls the present action upon the question of the location of Brockleface Gut.

The learned counsel for Mr. Frost says in his brief: "Every point of law and of fact to which principles of law were applied which was involved in the complaint in the *Lawrence* case is *res adjudicata* as between the parties here, Frost and Sandiford being the successors to Lawrence to that title."

The learned counsel for the plaintiff in their brief say: "*Lawrence* v. *Town of Hempstead* was severely litigated, was tried upon its merits and held upon the law which is claimed in this case to govern the issue therein."

Of course, the principles of law applied in the *Lawrence* case, if applicable, must be applied in this case, but the question is pre-

sented are they applicable to the testimony introduced by the plaintiff?

The conclusion was reached in the *Lawrence* case that the term meadow included salt marshes and beaches, and under the allotments shown in the testimony in that case the court held that the town's title to the property included in Fosdick's survey had been extinguished and that the ownership thereof was in the allottees who were grantors of Jacob Hicks.

The relative situation of the allotments proved in this case to the beaches and to the ocean is very different from the relative situation of upland and beach upon Rockaway neck which were under consideration in *Lawrence* v. *Town of Hempstead.*

In the *Lawrence* case it appeared that the marshes and beaches there under consideration were directly connected with the upland. They were accessible from Hicks' upland by a private lane leading from the highway southerly to the ocean, and from its southerly extremity teams, vehicles and cattle could pass to and from the marsh and land in controversy, and, as Judge GRAY said (p. 306): "It was altogether probable that Jacob Hicks should have desired to acquire the title to the meadow or marsh land which adjoined his upland and which communicated by his private lane with the highway."

The relative situation of the upland and the land in controversy in the *Lawrence* case is plainly shown by the map of the Lawrence property, which is Exhibit C in this action. But how different the situation in this case as depicted upon Exhibit 58. None of the property in controversy in this action communicates with any of the allotments of upland as located by Conklin. By the scale upon which Exhibit 58 is drawn these allotments of upland are from three to four and a half miles from the ocean, and are separated from the outer beach by Hempstead bay, which is filled by islands and deep navigable channels of water. None of the islands or beaches are accessible from the uplands except by boats.

The quantity of land in each allotment is specified. In some instances the length and breadth is given. None of the allotments in terms include the islands or the bay or the beaches.

I know of no rule of law by which these allotments could be extended to the islands and beaches in the bay, or be construed to include such property as is claimed in this action.

The learned counsel for the plaintiff concede that the allotments would not include navigable channels. Conceding this, I do not see how they could be held to extend across navigable channels and to take in and include land not within the boundary specified in the allotment.

The rule applied in the *Lawrence* case is applicable only to meadows, marshes and beaches which adjoin the upland and communicate with it. It has no application to such a situation as is shown to exist in this action.

I do not think that the plaintiff is entitled in this action to the benefit of anything decided in *Lawrence* v. *Town of Hempstead* (*supra*). He is not privy to the plaintiffs in that case. The testimony which he has introduced, if it is to be accepted as true, shows that the court acted under a misapprehension of the facts in the *Lawrence* case. Certainly it was essential to the plaintiffs' recovery in that action to show that the town's title had been extinguished, and that as to the property comprehended in the complaint title was in the grantors of Hicks. This clearly appears in Judge GRAY's opinion. He says (p. 302): "The point to reach in our consideration is whether the town's title appears to have been extinguished," and having referred to the fencing order of April 17, 1659, and the division of 1678 and other town records said (p. 303): "It seems to me that these town records of proceedings not only evidenced the inclosure of Rockaway Neck in 1659 and an allotment in 1678 of the meadow lands which comprehend the premises, but they evidence as well an intention to allot generally the common meadow lands of the town."

If it had appeared in the *Lawrence* case, as it appears here by the testimony of Conklin, that none of the Hicks grantors owned land west of East Rockaway inlet the plaintiffs would have failed to have shown that the town's title had been extinguished and the decision would probably have been for the defendant.

Excepting Post Lead the plaintiff's claim is substantially to the land outside of the Fosdick survey. His claim is as to land of which it has not heretofore been decided that the town's title has been extinguished. But the relative situation of upland and salt marshes and beaches is so different in this case from what was shown to exist in *Lawrence* v. *Town of Hempstead* (*supra*), that the rule of con-

SECOND DEPARTMENT, JULY, 1904.    [Vol. 97.

struction applied to allotments on Rockaway neck is not applicable to allotments upon Half neck, Great neck, Little neck or any other neck east of East Rockaway channel.

The plaintiff has produced no testimony tending to show that the town's title to the land in controversy was extinguished except the allotments plotted by Conklin upon Exhibit 58, and I think he has failed to show that the allotments included the land in controversy.

This conclusion is consistent with the history of the town with reference to the property in controversy. The town has uniformly dealt with the property as a part of its common lands. It has granted oyster leases, regulated the cutting of grass, and made grants of land by vote at the town meeting and more recently by vote of the town board. This control by the town has been exercised as to the property in dispute unquestioned by any person until the claim of Frost and the plaintiff was made. Neither Jacob Hicks nor any of his heirs claimed title to the property or disputed the title of the town. Neither did Alfred N. Lawrence or those who have succeeded to his title under the partition suit claim beyond the Fosdick survey.

The conclusion is also consistent with that construction of the deed to Jacob Hicks which I have indicated, namely, that it was a conveyance of a small beach or salt marsh adjacent to and accessible from Hicks' upland. As was said by Judge GRAY (pp. 304, 306): "Hicks' upland became known as 'Hicks' Neck,' (now Lawrence Neck) and is bounded on the east by the meadow land in question. * * * It was altogether probable that Jacob Hicks should have desired to acquire the title to the meadow or marsh land which adjoined his upland and which communicated by his private lane with the highway."

By the same process of reasoning it is impossible to understand why Hicks should have desired a conveyance of practically all of Hempstead bay, or why his grantors should have conveyed it to him if he did desire it, and it is equally impossible to understand why the allottees on the easterly necks should have desired to own the various islands and beaches in the bay which were not accessible from their upland, or why the town should have given the property to them by a description which conveyed only the upland and meadow.

The decision in the *Lawrence* case was made by a divided court. Judge GRAY and Mr. Justice PRATT, who wrote the prevailing opinions at the Court of Appeals and on the first argument at the General Term, both recognized the difficulties of the case and reached their conclusions with hesitation.

I think the plaintiff's testimony in this case has not clarified the situation, and the main effect it has had upon my mind is to cause me to doubt whether the *Lawrence* case was correctly decided.

The plaintiff, however, is entitled to the benefit of the decision in that case so far as it may be applicable to the facts now before the court, but as to the land in controversy east of Fosdick's survey, I decide that the plaintiff has not sustained the burden of proof, and that he has failed to show that the town transferred its title to the property in controversy to the grantors of Jacob Hicks, or that Brockleface Gut was further east than the inlet shown upon Fosdick's survey.

As I understand it, the property claimed by the plaintiff under the deed from Lawrence in 1889 began at a point 7,000 feet east of Wells' line.

The learned counsel for the plaintiff (upon p. 6 of their brief) say, "the division line is from the centre of Crooked Creek. The west part of Lawrence's grant is not here in question; that part which runs from a division fence and a mark in Crooked Creek to Wells' line on the west."

A cross fence is marked on Exhibit 58, and the plaintiff's claim apparently includes all of Hicks' beach; and by comparison between Exhibit 58 and Exhibit C and the Fosdick survey nearly all of the land conveyed to Lawrence by the referee in the Hicks' partition action.

The question is presented from these facts whether the plaintiff is entitled to a decree in his favor as to that part of the property included in the description in the judgment in *Lawrence* v. *Town of Hempstead*, excepting, of course, Post Lead. I think he is not.

The plaintiff and Frost, his grantor, were purchasers of the property while the *Lawrence* case was pending. They acquired a part of the land which was the subject of that action and thereby became vested with a part of Lawrence's cause of action against the town. Under section 756 of the Code of Civil Procedure they could have

caused themselves to have been made parties to that action, or they could, as they did, permit the action to be continued in the names of the original plaintiffs.

If, therefore, there is now any interference by the town with the property or any violation of the judgment in *Lawrence* v. *Town of Hempstead*, the plaintiff's remedy is to enforce the judgment in that action.

As to the Post Lead tract the question is different, and as to that property the plaintiff is entitled to a judgment upon the authority of the *Lawrence* case.

That tract was conveyed by Lawrence to Frost in 1887 before the case of *Lawrence* v. *Town of Hempstead* was commenced. Frost's deed to the plaintiff bears date in 1894. While the description in the complaint and judgment in the *Lawrence* case embraced the Post Lead tract, Lawrence had no interest or title to that property when the suit was commenced and no cause of action in reference thereto against the town.

These facts, I think, would be a good defense to any attempt or application by the plaintiff to enforce the Lawrence judgment so far as it might affect the Post Lead property.

Upon the assumption that the town's title to Post Lead was extinguished by the fencing order of 1659 and by the division of meadows in 1678 and upon the authority of the decision in *Lawrence* v. *Town of Hempstead* (*supra*), Frost and the plaintiff have title to Post Lead, and as there is proof that the town has leased parts of the property for oyster planting and so interfered with the plaintiff's possession, there must be judgment in the plaintiff's favor as to that tract of the same character as that awarded in the *Lawrence* case.