HENRY N. BEERS, Respondent, *v.* HENRY G. HOTCHKISS et al., Respondents, and HILAIRE E. CAMPBELL et al., Appellants.

42

(Argued February 18, 1931; decided March 24, 1931.)

*Joseph Steven Frank* for appellants. It was error to hold that the survey, division, drawing and allotment of that part of the former town commonage known as Quogue Purchase, last division, in 1782, as entered in the town records, did not take title to the *locus in quo* out of the town trustees. (*Powers* v. *Shepard,* 48 N. Y. 540; *Trustees of Southampton* v. *Betts,* 163 N. Y. 454; *Peterson* v. *Martino,* 210 N. Y. 412; *Constantine* v. *Van Winkle,* 6 Hill, 177; 10 N. Y. 422; *Lawrence* v. *Town of Hempstead,* 155 N. Y. 297; *People* v. *Livingston,* 8 Barb. 253; *People ex rel. Howell* v. *Jessup,* 160 N. Y. 249; *Trustees of East Hampton* v. *Kirk,* 68 N. Y. 459; *Town of Southampton* v. *Mecox Bay Oyster Co.,* 116 N. Y. 1; *Sandiford* v. *Town of Hempstead,* 97 App. Div. 163; 186 N. Y. 554; *Town of Southampton* v. *Flanders Club,* 113 Misc. Rep. 451.) It was error to hold that the quitclaim deed from the trustees of the proprietors of the common and undivided lands conveyed the premises in suit or any other theretofore divided and allotted property. The legal effect of the allotment becomes immaterial when it appears that the deed refers only to undivided land, meaning land which had never been the subject of a division and allotment in fact. Plaintiff is proceeding in equity and it was error to grant him judgment when it appeared that he founded his title on an unconscionable construction of this quitclaim. (*Matter of City of New York* [*Avenue D*], 200 N. Y. 536; *French* v. *Carhart,* 1 N. Y. 96; *Wilson* v. *Ford,* 209 N. Y. 186; *Lamb* v. *Norcross Brothers Co.,* 208 N. Y. 427; *Thayer* v. *Finton,* 108 N. Y. 394; *Town of Southampton* v. *Betts,* 163 N. Y.

454; *Town of Southampton* v. *Mecox Bay Oyster Co.*, 116 N. Y. 1; *Denton* v. *Jackson*, 2 Johns. Ch. 320; *Trustees of East Hampton* v. *Kirk*, 68 N. Y. 459; *Lawrence* v. *Town of Hempstead*, 155 N. Y. 297; *Sandiford* v. *Town of Hempstead*, 97 App. Div. 163; 186 N. Y. 554; *Town of Southampton* v. *Flanders Club*, 113 Misc. Rep. 451.) It was error to hold that the English Statute of Frauds of 1677 applied or that divisions and allotments prior to the first State Statute of Frauds of 1787 were invalid. (*Trustees of East Hampton* v. *Kirk*, 68 N. Y. 459; *Sandiford* v. *Town of Hempstead*, 97 App. Div. 163; 186 N. Y. 554; *Lawrence* v. *Town of Hempstead*, 155 N. Y. 297; *Starr* v. *Child*, 20 Wend. 149; *Town of Brookhaven* v. *Smith*, 188 N. Y. 74; *Sanger* v. *Merritt*, 120 N. Y. 109; *Shinnecock Hills Co.* v. *Aldrich*, 132 App. Div. 118; *Constantine* v. *Van Winkle*, 10 N. Y.422.)

*Lucius H. Beers* and *John R. Vunk* for respondents. The land has been unfenced, uncultivated and unoccupied. (*Thompson* v. *Burhans*, 79 N. Y. 93; *Mission* v. *Cronin*, 143 N. Y. 524; *Wiechers* v. *McCormick*, 122 App. Div. 860.) Where land has not been occupied, improved or inclosed, title must be derived from the original patentee or donee. (*Miller* v. *Long Island R. R. Co.*, 71 N. Y. 380; *Bliss* v. *Johnson*, 94 N. Y. 235; *Archibald* v. *New York Central R. R. Co.*, 157 N. Y. 574.) Respondents hold title under an unbroken chain of title from the original patentee. (*Mitchell* v. *United States*, 9 Pet. 711; *Johnson* v. *McIntosh*, 8 Wheat. 543; *Howard* v. *Moot*, 64 N. Y. 262; *Town of Southampton* v. *Mecox Bay Oyster Co.*, 116 N. Y. 1; *Sanford* v. *Lindley*, 179 App. Div. 940; *Risty* v. *Chicago & Rock Island & P. Ry. Co.*, 270 U. S. 378; *Denton* v. *Jackson,* 2 Johns. Ch. 320; *Town of Southampton* v. *Betts*, 163 N. Y. 454; *Sanders* v. *Townsend*, 89 N. Y. 623; *Miller* v. *L. I. R. R. Co.*, 71 N. Y. 80.) There was no allotment in 1782. (*Sanger* v. *Merritt*, 120 N. Y. 109.) If there had been an allotment in 1782,

it would not have transferred title in the absence of a deed from the town corporation. (*Appleton* v. *City of New York*, 163 App. Div. 680; 219 N. Y. 150; *Finch Pruyn Co.* v. *State of New York*, 122 Misc. Rep. 404; *Denton* v. *Jackson*, 2 Johns. Ch. 320; *Bogardus* v. *Trinity Church*, 4 Paige, 178; 15 Wend. 11; *Shinnecock Hills Co.* v. *Aldrich*, 132 App. Div. 118; *Lawrence* v. *Town of Hempstead*, 155 N. Y. 297.) A local custom as to transfer of title to lands cannot overcome the force of the Statute of Frauds. (*Colgate* v. *Pennsylvania Co.*, 102 N. Y. 120.) The statute of 1818 which related to the und vided lands of the town applied to the lands which were then owned by the town. (*People* v. *Wainwright*, 237 N. Y. 407; *Perkins* v. *Smith*, 116 N. Y. 441.)

CARDOZO, Ch. J.   In this action of partition, the plaintiff and the defendants Hotchkiss have won a judgment of the court that the defendants Campbell, the appellants, have no interest in the property and are unlawfully possessed of it.

Upon this appeal, the appellants abandon any claim that they have justified their possession by the strength of their own title, and take their stand upon the position that the respondents, who seek to oust them, do not show a better right.

The action, though in form partition, is in substance one of ejectment in so far as its purpose is the extinguishment of hostile claims (*Kellum* v. *Corr*, 209 N. Y. 486, 490; *Satterlee* v. *Kobbe*, 173 N. Y. 91, 95; *Brown* v. *Feek*, 204 N. Y. 238). The respondents, if they are to uphold the judgment, must do so on the strength of their own title, and not merely on the weakness of the title of their adversaries (*Trustees, etc., of Southampton* v. *Betts*, 163 N. Y. 454, 457; *McRoberts* v. *Bergman*, 132 N. Y. 73).

The *locus in quo* is in the town of Southampton, Suffolk county, and is a portion of lots numbers 31, 32, 33, 34

and 35 in the last division of the Quogue Purchase, a division of common lands made or ordered by the town authorities in 1782.

As early as 1647, inhabitants of Southampton had been contributors to a fund of £6,000, which was expended in the purchase of lands for the use of the new community. The contributors were known as the "proprietors," and were deemed to have at least an equitable interest in the lands so purchased. The inhabitants resolved in town meeting (Southampton Town Records, vol. 1, p. 50) that the town be divided "into fortie house lots, some biger, some less, as men have put in a share, six thousand pounds to be divided in to fortie parts." By force of this division of £6,000 by forty, each lot had a value of £150, and the lots thus divided were subdivided into three £50 parts, with the result that an allotment became known as a "fifty" or a "fifty right." When new purchases were made afterwards with new allotments following, the "fifties" were still the units.

Southampton in its beginnings was without a royal patent, though its inhabitants like true precursors of the thought of Hobbes and Locke, had organized themselves already into a political community. The defect in the documents was supplied by the Andros patent of 1676 and the Dongan patent a decade later. By these, the title to the town lands was vested in a public corporation, the Trustees of the Freeholders and Commonalty of the Town of Southampton. From time to time thereafter the trustees allotted shares or portions of the common lands to the use of the "proprietors." The procedure followed at such times is stated in the findings. The trustees voted the appointment of indifferent persons as layers-out with instructions to lay out for subdivision certain land located by general reference to its situation in the town. The layers-out surveyed the land and laid it out into lots, known by numbers, recording in the town records the survey and division. Thereafter on

notice to all proprietors, a drawing for the lots was held among the proprietors or persons entitled to an interest in the lands as successors to the original proprietors; and thereafter a record of the drawing, with the name of the person or persons drawing each numbered lot, was entered in the town records, certified by the clerk of the town corporation (cf. Osgood, American Colonies of the 17th Century, vol. 1, p. 461). The Lower Division of the Quogue Purchase was laid out in 1738, the Upper Division in the same year, the Canoe Place Division in 1739, the Accabog Division in 1763, the Divisions of Toppings Purchase in 1748 and 1782, other divisions in other years, and finally the Last Division of the Quogue Purchase in 1782.

This last division includes lots 31 to 35 inclusive, which take in the premises in suit. On May 28, 1782, the Trustees of the Freeholders and Commonalty of the Town of Southampton at a regular meeting thereof voted that certain named persons should lot the land in Quogue and Toppings Purchase, which appointment is recorded in the records of the town corporation. Of these appointees, John Sandford and David Halsey caused a survey and division into lots to be made of a large tract, including the premises in suit. They rendered a report to the town corporation, which report was entered in its records and certified by the clerk of the corporation, July 3, 1782. Thereafter, the lots so described and reported were drawn for by the several proprietors, after due notice, on July 4, 1782, and the report of the drawing is entered in the corporate records under that date. The allotments so recorded give the numbers of the lots (31 to 35), the names of the allottees, and the fractional interest awarded to each. There is criticism of the regularity of the procedure in that a resolution confirming the survey and the drawing is not entered on the records. Comparing the record of this allotment with that ·applicable to others, we think substantial regularity must be

held to have been observed. The practice was for the trustees in confirming a survey to direct the proprietors to meet and proceed to the usual drawing. When we find upon the town records a report that such a meeting was held after due notice and find upon the same records a report of the result of the drawings, the regularity of the intermediate proceedings between the survey and the meeting may safely be presumed. Courts do not look at records with over-technical eyes after the healing acquiescence of a century and a half (*Lawrence* v. *Town of Hempstead*, 155 N. Y. 297, 301). The question, however, is not an open one, for the referee has found in effect that the procedure amounted to an allotment under the practice then prevailing. He states in his decision that " in 1782 lots numbers 31 to 35 inclusive, in the division of land in said town known as the Last Division of the Quogue Purchase were laid out and allotted to certain individuals." The respondents, not excepting to the finding, adopt it as correct (*Cox* v. *Stokes*, 156 N. Y. 491).

An allotment, then, there was, but its existence alone does not determine its effect. If its effect was the same as a conveyance, title to the *locus in quo* went out of the trustees in 1782. The respondents insist that such effect is excluded by the Statute of Frauds of England and the Colonies. *Sanger* v. *Merritt* (120 N. Y. 109; 131 N. Y. 614) is authority for the proposition that the force of a conveyance is denied to an allotment by the Statute of Frauds of 1787, adopted in this State after the war of independence (Laws of 1787, ch. 44; 1 R. L. 75). It leaves the question open whether there was any statute of frauds in 1782 or earlier in that century.

Charles II in making a grant of the colony to his brother, the Duke of York, in 1664, directed him to govern the inhabitants according to such laws, orders, ordinances, directions and instruments as should be by

him established, and in defect thereof, according to the good discretion of his deputies, but " soe allwayes as the said Statutes, Ordinances and Proceedings of his deputies, bee not Contrary to but as neare as conveniently may bee agreeable to the Lawes, Statutes and Governement of this our Realme of England " (Colonial Laws of New York, vol. 1, p. 2; *The Lauderdale Peerage*, L. R. 10 A. C. 692, 751).

By the Duke's Laws, promulgated by the Duke of York at Hempstead, Long Island, March 1, 1665, no alienation of lands was to be good unless done by deed (to be acknowledged and recorded unless possession given), but with the proviso " that this Law shall not extend * * * to any Land granted or to be granted by the Inhabitants of a Town " (Colonial Laws of New York, vol. 1, p. 30). This proviso is broad enough to exclude a conveyance by allotment. Later statutes, more general in their terms, were adopted in 1683 and 1684 by the General Assembly of the Colony, which had its first meeting in the city of New York in October, 1683. The first statute was to the effect that every conveyance should be recorded where the consideration exceeded £50 (Colonial Laws of N. Y., vol. 1, p. 142). It was directed not so much to the form of alienation as to the requirement of a record. The second statute (Colonial Laws of New York, vol. 1, p. 148) was to the effect that no bargain, sale, mortgage or grant should be good unless by deed in writing, " and possession given in part in the name of the whole " by the grantor or his attorney, and unless the deed be acknowledged within one year after sealing thereof and duly recorded. In those years Thomas Dongan was the Governor-General of the Province. Acting under the instructions set forth in his commission he had summoned a General Assembly, whose acts, if assented to by him, were to be good and binding until rejected by the Duke of York, from which time they were

to be null and void (Colonial Laws of New York, vol. 1, pp. 108, 109). When James, Duke of York, became King under the title of James II (February 6, 1685), he issued a new commission, 1686, to the Governor-General of the Province. By these instructions (Colonial Laws of New York, vol. 1, p. 178), the King repealed and disallowed a certain statute known as the charter of liberties and privileges which had been adopted by the General Assembly in 1683, and then proceeded to a declaration of his royal will and pleasure in respect of other laws. " Our further will and pleasure is that all other Laws, Statutes & Ordinances already made within Our said province of New York shall continue & bee in full force & vigor soe far forth as they doe not in any wise contradict, impeach or derogate from this Commission or the Orders and Instructions herewith given you, till you shall, with the advice of our Council, pass other Laws in our Name for the good government of our said Province, which you are to doe with all convenient speed " (Colonial Laws of New York, vol. 1, p. 180; and introduction by R. C. Cumming, p. XVII; also Documents Relating to Colonial History of New York, vol. 3, p. 370).

The respondents argue that the effect of the instructions was to confirm the colonial statutes of 1683 and 1684, if confirmation until then was lacking. Against this we are referred by the appellants to the decision of this court in *Van Winkle* v. *Constantine* (10 N. Y. 422), approving an earlier decision of the Supreme Court in *Constantine* v. *Van Winkle* (6 Hill, 177, 208), and also to a resolution of the General Assembly in 1691. Dicta in *Van Winkle* v. *Constantine* give support to the position that the statutes were at an end. The decision itself was narrower. The decision was directed to a provision of the charter of liberties of 1683 regulating the form of acknowledgment upon a conveyance by a married woman (Colonial Laws of New York, vol. 1, p. 114). The

charter of liberties, as we have seen, is the one act of the Assembly that had been disallowed by the King in his commission to the Governor, and excepted from his instructions as to the continuance of earlier laws. A ruling that this act did not retain the force of law is inconclusive as to others.

More perplexing is the effect of a resolution adopted by the Assembly after the " happy revolution " of 1688, and the accession of William and Mary (see 10 N. Y. at p. 428). This resolution, adopted in 1691, is to the effect that " all the laws consented to by the General Assembly, under James, Duke of York, and the liberties and privileges therein contained, granted to the People, and declared to be their Rights, not being observed, and not ratified and approved by his Royal Highness, nor the late King, are null, void and of none effect." There is no evidence, it seems (Cumming, Introduction to Colonial Laws of New York, vol. 1, p. XIX), that this resolution ever had the approval of the Governor-General or the Council, without which approval it did not have the force of law. Even so, it is significant as a token of contemporary opinion. " There is, no doubt, much force in the suggestion that a solemn declaration of the lower house of Assembly to the effect that a great political event entailed certain consequences on the laws of this province, is not to be lightly disregarded by the courts two centuries later " (Robert Ludlow Fowler, introduction to a Facsimile of Bradford's Laws of the Province of New York, 1694, p. LXXXII). Significant, too, is the omission of the colonial acts from subsequent collections of the statutory laws. Livingston and Smith were directed in 1750 to digest and collect in one volume all the laws in force in this colony from the said revolution (Colonial Laws of New York, vol. 3, p. 832). They began with the colonial legislation of 1691. Van Schaack, appointed by the General Assembly in 1772 (Colonial Laws of New York, vol. 5, p. 355), did the same. On the strength of these

proofs, we have the dicta already mentioned in *Van Winkle* v. *Constantine*, and *Constantine* v. *Van Winkle* (*supra*) to the effect that with the revolution of 1688 the earlier colonial statutes were extinguished altogether. On the other hand, contemporary usage, buttressed in these later days by the researches of historians, is strongly the other way. The resolution of 1691, if it be taken at its face value, does not include the Duke's Laws. It is limited by its terms to the laws consented to by the General Assembly, which did not come into existence until 1683. The minutes of the Supreme Court of Judicature show that provisions of the Duke's Laws, as well as provisions of the acts of the General Assembly, were deemed to have the force of law long after the adoption of the resolution which is said to have put an end to them (see *e. g.*, 45 New York Historical Society Collections, 43, 123; Minutes of the Supreme Court, April 4, 1693, applying the act of October 22, 1684, 1 Colonial Laws, 147; Minutes of the Supreme Court, October 7, 1699, applying the act of October 23, 1684, 1 Colonial Laws, 150; cf. 1 Colonial Laws, 4). The persistence of some of the provisions of the acts of 1683 and 1684 — the provisions governing the record of conveyances — has confirmation in an act of 1710 (Colonial Laws of New York, vol. 1, ch. 216), which provides that copies of such records shall be legal evidence in the courts. The assumption plainly is that records are still made with the authority of law (cf. Act of Feb. 16, 1771; 5 Colonial Laws of New York, 202; Act of March 8, 1773; 5 id. 534; Act of Oct. 30, 1708, 1 Colonial Laws of New York, 633). These evidences of usage are in harmony with the judgment of historians. The resolution of 1691 is the subject of a learned discussion in the introduction by Robert Ludlow Fowler, later one of the Surrogates of New York County, to a facsimile edition of Bradford's Laws and Acts of the Province of New York (pp. LXXVIII to LXXXIII), and also in the preface by Robert C.

Cumming to the edition of the Colonial Laws of New York published by the Statutory Revision Commission in 1894 (pp. XIX, XX). The conclusion is there expressed that the earlier statutes of the colony were preserved by the instructions of James to his Governor continuing them in force except as otherwise disallowed, and that the resolution of the Assembly, not approved by the Governor or Council, was without the force of law. So, in 1764, an opinion of the Attorney-General, of which more will be said later, upholds the practice of allotment, but is framed on the assumption that the practice, rooted in ancient usage, is an exception to the general rule (New York Historical Society Collections, vol. 55, p. 391; Colden's Papers). With all these evidences of the survival of the early statutes, the dicta in *Van Winkle* v. *Constantine* (*supra*) cannot safely be accepted today as a statement of established law. The theme is still one for antiquarian research.

The respondents insist, however, that irrespective of the effect of the colonial statutes of 1683 and 1684, the Statute of Frauds of England, which was adopted by Parliament in 1676 to take effect June 24, 1677 (29 Car. II, ch. 3) was law also in New York. This is an unsettled question (Reed, Statute of Frauds, § 2, and cases there cited; *Sanger* v. *Merritt, supra*). We are referred by the respondents to section XXXV of the Constitution of 1777 to the effect " that such parts of the common law of England, and of the statute law of England and Great Britain, and of the acts of the legislature of the colony of New York, as together did form the law of the said colony on the 19th day of April, in the year of our Lord 1775, shall be and continue the law of this State." This declaration does not enlighten as to the problem now before us. Only those parts of the statute law of England that formed the law of the Colony at the date of the Battle of Lexington are to be held as law thereafter, and we are left to discover what those

statutes were. There was no adoption *en bloc* of every act of Parliament, irrespective of its subject-matter or of the usage of the colony. A distinction is often drawn between the statutes of the mother country in existence at the settlement of a colony and those adopted afterwards. The first are deemed to have entered into the fabric of the common law, and like the common law itself became law in the colony unless unsuited to the new conditions (Reinsch, Colonial Common Law, Select Essays in Anglo-American Legal History, vol. 1, p. 390; *The Lauderdale Peerage*, L. R. 10 A. C. 692, 744). The second were not operative beyond the limits of the realm of England unless expressly declared to be operative abroad (*The Lauderdale Peerage, supra; Sackett* v. *Sackett*, 8 Pick. 306, 316, 317; *Guardians of the Poor* v. *Greene*, 5 Binney [Pa.], 554, 558; R. B. Morris, Studies in the History of American Law, pp. 12, 13, 15). This was a common formula, yet subject, we may be sure, to be overridden or enlarged by usage. One of the chief difficulties confronting a student of our legal history is that the whole subject of the reception of English law, both common and statutory, was not thought out in any consistent way, but was left unsettled and in the air. The plaint was a common one that " no one can tell what is law and what is not in the plantations " (Sioussat, The Theory of the Extension of English Statutes to the Plantations, Select Essays in Anglo-American Legal History, vol. 1, pp. 429, 430).

Practice and doctrine wavered for many years (Reinsch, *supra*). New York is said to have developed a coherent theory earlier than other colonies (Reinsch, *supra*, p. 390), yet the coherence was such by comparison merely. In a report by Governor Tryon to the Crown, made in 1774, he says that " the Common Law of England is considered as the Fundamental law of the Province, and it is the received Doctrine that all the Statutes (not Local in their Nature, and which can be fitly applied to the circumstances

of the Colony) enacted before the Province had a Legislature, are binding upon the Colony, but that Statutes passed since do not affect the Colony, unless by being specially named, such appears to be the Intentions of the British Legislature " (Documentary History of New York, vol. 1, pp. 752, 754; cf. Sioussat, *supra*, p. 486). There was no Colonial Assembly till 1683, but even before that time the Court of Assizes was invested with legislative power (Cumming's Introduction to Colonial Laws of New York, vol. 1, p. XIII; Documents Relating to the Colonial History of New York, vol. 3, p. 188). Whether the Court of Assizes is to be classified as a legislature within the sense of Tryon's formula may be open to debate. Probably the line of division between reception and rejection was not quite so precise as the letter of the formula might be thought to imply. The more natural division would be between the time when the Colony had laws of its own — whether proceeding from an assembly or from any other competent authority — and the time when it had none (cf. Chalmers, Colonial Opinions, p. 207, where the line of division is stated to be the settlement of the Colony). If that is the test, the act of Charles II, being silent as to the colonies, was not law for their inhabitants. The good people of the Province already had a law of their own, a provision of the Duke's Laws of 1665, which covered the same field, with exceptions appropriate to local conditions. The query suggests itself also what reason there was for the colonial acts of 1683 and 1684 if the act of Parliament was in force *ex proprio vigore*. On the other hand, the evidences are many that the rule of the statute became incorporated into the law of the Colony by the force of analogy and usage. The practice, however, was not uniform. Governor Moore, writing to the Lords of Trade in February, 1768, complains of " the uncertain determinations, and different opinions of the Judges relative to Acts of Parliament, * * * so that in effect the

issue of a cause depended not so much on the right of the Client, as on the breath of the Judge, and what was looked upon as a very good plea in one circuit was disallowed in another " (8 Documents Relative to Colonial History of New York, 14). From time to time attempts were made to dissipate the " doubts and scruples " (Colonial Laws of New York, vol. 4, p. 953), which were not unknown even then. Thus an act of December 24, 1767 (Colonial Laws of New York, vol. 4, p. 953) provided for the extension to New York Province of certain acts of Parliament continuing the statute of 1 Jac. II, ch. 17, §§ 5, 6, 7, of which section 5 extended and made perpetual the last section (25) of 29 Car. II, ch. 7 (cf. 8 Documents Relative to the Colonial History of New York, 14), but the act was vetoed by the Crown in 1770. There is a significant recital: " Whereas divers acts of Parliament passed since the Establishment of a Legislature in this Colony, have nevertheless been practised upon us extending to this Colony; tho' they are not declared in the said Acts to extend to the Plantations." Even more significant is the recital in an act of 1774 (Mar. 19, 1774, Colonial Laws of New York, vol. 5, p. 689): " Whereas the Statute for the Prevention of Frauds and Perjuries hath been received by Usage as Law in this Colony, and amended by a subsequent Statute passed after the establishment of a Legislature within this Colony." Here, it would seem, is a legislative recognition both of the act of 29 Car. II and of the colonial legislation confirming or amending it.

If usage was potent to bring an act of Parliament into effect, usage must also have been potent to define the scope of its reception. This much at least is clear, the colonists were not conscious of any antagonism between the provisions of the statutes and the usage whereby town lands were parceled out to the proprietors by allotment noted on the records. The usage persisted for a century and more (Book of Records of the Town of

Southampton [printed in four volumes, 1874], see *e. g.*, vol. 2, p. 76 [1679]; p. 86 [1681]; p. 91 [1680]; p. 110 [1686]; p. 117 [1686]; p. 123 [1687]; p. 125 [1691]; p. 139 [1697]; p. 143 [1700]; pp. 149 to 166 [1712]; vol. 3, p. 7 [1737]; p. 13 [1739]; p. 24 [1740]; p. 74 [1745]; p. 82 [1745]; p. 88 [1738]; p. 92 [1738]; p. 97 [1738]; p. 106 [1738]; p. 120 [1738]; p. 129 [1739]; p. 191 [1761]; p. 195 [1763]; p. 208 [1763]; p. 230 [1763]; p. 240 [1763]; p. 294 [1782]; p. 301 [1782]). The allotments thus made covered tracts of vast extent and were accepted without protest as a sufficient source of title (cf. *Town of Southampton* v. *Mecox Bay Oyster Co.*, 116 N Y. 1; *Lawrence* v. *Town of Hempstead*, 155 N. Y. 297). On one occasion, if not oftener, there was a statute confirming the divisions of the past, and declaring that like divisions might be made in the future " in the Same manner & method as has usually been practized " (Colonial Laws of New York, vol. 2, p. 329, at pp. 336, 337, act of Nov. 11, 1726). True it is that this statute was repealed by the King in February, 1728 (Colonial Laws of New York, vol. 2, p. 329). The repeal, however, is of little significance as affecting the validity of divisions by a township. Included in the same statute were provisions for the informal partition of lands of private owners, grantees of extensive tracts, which provisions, it seems, had aroused protest and criticism as tending to permit fraud (5 Documents Relating to the Colonial History of New York, pp. 807, 808, and see particularly p. 809, subd. 10). At these, we may fairly assume, the King's repeal was aimed. In spite of the repeal, there stands for our enlightenment this significant recital: " Whereas much the greater Number of the Townships Settled in this Province in dividing their Lands amongst themselves have done the Same by Virtue of and according to the directions of the Votes of the Freeholders and Inhabitants at their Publick Town meetings from time to time Assembled for that purpose which divisions being generally very well accepted of and Acceded to by the respective Pro-

prietors and Possessors of those Lands" (p. 336). What was enacted as to the town allotments was merely an incidental feature of a comprehensive statute embracing other subjects. There was surely no purpose by the repeal to overturn or unsettle titles of immemorial acceptance. Confirmation of anything so fundamental must have been felt to be a mere formality. The final arbiter was usage. Doctrine had not established itself sufficiently to be superior to practice. To learn what the law was we must try to ascertain what the colonists of those days believed it to be, and to learn what they believed it to be we must try to discover what they did.

The respondents, rejecting the allotments as insufficient to divest the title of the township, take their stand upon the pos tion that in 1818 lots numbers 31 to 35 of the Quogue Purchase, Last Division, were still undivided commons, the title vested in the township or in the trustees that represent it. The reason why the year 1818 is important is because in that year the Legislature passed a statute whereby whatever title to the undivided lands had belonged theretofore to the Trustees for the Freeholders and Commonalty of the Town of Southampton was transferred to a new body corporate, " the Trustees of the Proprietors of the undivided lands of the town of Southampton " (Laws of 1818, ch. 155). The provisions of this statute, since they are the source of the respondents' claim of title, must be stated with precision. By section 1, " the proprietors of the undivided lands and meadows, held by them as tenants in common," were authorized to meet at a stated time, and annually thereafter, to elect for the term of one year " not less than six nor more than twelve persons, being proprietors, trustees to manage all the undivided lands, meadows and mill streams in said town of Southampton." By section 2, the trustees were declared to have " the same power to superintend and manage the undivided lands, meadows and mill streams " as had formerly belonged to the

trustees of the freeholders and commonalty of the town, and also to sell, lease and partition them. By section 3, the clerk of the trustees was charged with a duty " to keep a record of the names of each proprietor, and the amount of right to him or her belonging, and to make transfers of the same;" and no person was to be " entitled to a vote at any meeting of said proprietors, without their names are entered on said record."

The respondents' claim of title to the premises in suit is derived through mesne conveyances from a sale by the trustees of lands described as undivided. On November 7, 1882, the Trustees of the Undivided Lands of the Town of Southampton delivered to one Maxwell for a consideration of $500 a quitclaim deed of all the right, title and interest of the grantors in the undivided lands under water in Shinnecock bay within the limits of the Quogue Purchase; the lands under water in the Great South bay and connected creeks within the same limits; the lands under water in Canoe Place pond; and the beach and shore of Peconic bay within stated bounds. If the quitclaim had stopped there, it would have given no color of right to a claim of title to the land in suit. In closing, however, it supplements the detailed description by a more general one as follows: " together with all other undivided lands which may exist within the limits of the said Quogue Purchase (so-called). This deed being intended to convey all the right, title and interest which the proprietors of the undivided lands have in said Quogue Purchase (so-called)." The respondents' claim of title to the upland is based upon this clause. The later deeds in the chain of title repeat the same description without change of substance until May, 1928, when a deed was made to the defendant Hotchkiss. Then for the first time a new description makes its appearance. The land is then described for the first time as including lots 31 to 35 in the Quogue Purchase, Last Division, or the portions of those lots described in

the complaint. Later Hotchkiss and wife conveyed an undivided third of what they owned to the plaintiff Beers. Campbell was then in possession of part of the property, having cleared it for an aviation field and built a hangar for aircraft. He does not, however, connect himself with the title of any of the early allottees. The referee has found that " it is not possible by any connected chain of title to trace the interests of the several persons to whom said lots were laid out and allotted as aforesaid." Some of the allottees did execute deeds conveying parts of lots 31 to 35 of the Quogue Purchase, though one cannot say at this day whether the parts so conveyed are the premises in suit or others. So far as this record shows, Campbell's possession is that of a squatter, who has entered upon wild and vacant land and used it as his own. Even so, the respondents are in no position to disturb his possession or challenge his title unless they are able upon this record to make out a better right.

The trustees of the undivided lands of the town of Southampton were without authority to sell the premises in suit in 1882 unless what they sold was in truth undivided land within the meaning of the statute (Laws of 1818, ch. 155). The premises are not described in the conveyance by metes and bounds or monuments. They are described merely as the undivided lands in the Quogue Purchase. The respondents, to make out a title to the real property in suit, must prove that what they claim comports with that description. The burden is not on the appellants to show that the land was not undivided. The burden is on the respondents to prove that it was. The case hinges on the question whether such proof has been supplied.

In the existing uncertainty as to the law of colonial New York, we assume, without deciding, that in the year 1782, there was in existence in the Colony a statute of frauds, either the British one of 1677 or the colonial

one of 1684, that regulated the form of alienation and conveyance for ordinary private grants. The result will be the same whether the rule derived its efficacy from the mandate of the Legislature or from an extension of the common law through the power of analogy. If the rule was in existence, we think it was understood to be subject to the usage whereby division of the town lands was made among proprietors by allotment or partition entered on the records. We find it incredible that the British statute — the act of 29 Car. II — which did not bind the colonies by any declared extension of its scope, should have been imported by the colonists and wrought by implication into the body of the local law with any thought that the local usages, though persisting unabated during the period of reception, would thus be overridden (cf. the recitals in Colonial Laws of New York, vol. 5, p. 689, already quoted). The statute, if it established itself in the new home, did not win its way over night. It worked itself into the tissues of the law with the progress of the years by a process of assimilation akin to the method by which common law develops. In becoming law, it acquired an incrustation of beliefs and usages that must have shaped its scope and meaning.

What is true of the British act is true also, for reasons not dissimilar, of the colonial acts of 1683 and 1684, if we assume that after 1691 they had the quality of law at all. The practice of partition by allotment and vote of the proprietors has had judicial recognition in other States and Colonies (*Codman* v. *Winslow*, 10 Mass. 146; *Inhabitants of Springfield* v. *Miller*, 12 Mass. 415; *Coburn* v. *Ellenwood*, 4 N. H. 99). There is evidence that in the Colony of New York the courts dealt with the practice in a like spirit of liberality. An opinion of the Attorney-General, John Tabor Kempe, was transmitted in November, 1764, to Cadwallader Colden, Lieutenant Governor of the Province (New York Historical Society Collections, vol. 55, p. 391; Colden's Papers). "I under-

stand," he says, " that the Township was granted in Joint Tenancy and that all the Right the Inhabitants have to hold in severalty is the Orders made at their Town Meetings, and entered in their Minutes, & that tho this could convey no legal Title to hold in severalty, yet the Courts of Justice, considering the Ignorance of those Times, and the Confusion the Contrary would introduce have admitted them as valid for that Purpose." In the face of that opinion we may well hesitate at this day to test the forms of alienation by a standard of formality unknown to the age that framed them.

There was, indeed, much to excuse the ignorance of the colonists, if ignorant they were, as the Attorney-General suggests. The Duke's Laws of 1665, covering the same field as the acts of later date, expressly excepted conveyances by the inhabitants of towns, conveyances more nearly akin to partitions than to formal deeds of grant (Colonial Laws of New York, vol. 1, p. 30). We cannot feel assured today that the later acts were understood by the community to have retained their binding force. Still less can we feel assured that they were understood even by the framers to have repealed the old exceptions. A practical interpretation, too strong to be ignored, is evidence of the intention of the lawmakers that the exceptions should survive. Significant at all times in shaping the construction of a statute is contemporary usage, unless, indeed, the meaning is so plain that construction is excluded ( *United States* v. *State Bank*, 6 Pet. [U. S.] 29; *The City of Panama*, 101 U. S. 453, 461; *Logan* v. *Davis*, 233 U. S. 613, 627). " *Contemporanea expositio est fortissima in lege* " (*The City of Panama, supra*). Its potency is magnified many fold when the antiquities of the law must be explored to unearth the applicable rule. A landowner of 1782, the date of the allotment in suit, could not have discovered the existence of these acts by an examination of the official collection of the statutes then in force. He had

little guide except the usages that were known to him and to his neighbors. All this must be taken into account in determining the validity of the traditional methods of conveyance. We are not at liberty a century and half later to give to ancient statutes, whose very existence is and was in doubt, a meaning and operation at variance with the practice of the vicinage. Conceding *arguendo* that the acts were in force and were applicable to private grants, we limit their application within the bounds of ancient usage, and thus exclude from their coverage the common forms of allotment by towns or their inhabitants.

*Sanger* v. *Merritt* (*supra*) does not, we think, constrain us to a different conclusion. The allotment there considered was made in 1797. The Colony of New York had then become a State, and the Legislature of the State had adopted a new statute (Laws of 1787, ch. 44), which was unquestionably law. The mists had been dispelled. Ignorance would no longer avail as an excuse. Landowners might not unreasonably be required, irrespective of past usage, to comply with the new mandate unequivocably declared. There would have been hardship in a like exaction in days when the very existence of the statute to be obeyed was shrouded in obscurity. In a primitive community, with unsettled and evolving rules, there is need of greater play for the joints of the machine. All this was recognized in our decision in *Lawrence* v. *Town of Hempstead* (*supra*), which may fairly be offset against the earlier decision in *Sanger* v. *Merritt*, if the case is to be decided on the basis of precedent alone. In *Lawrence* v. *Town of Hempstead*, the plaintiff's title had its origin partly in a fencing order made in 1659, and partly in an allotment made in 1678. The court upheld the title both as to the lands covered by the order and as to those covered by the allotment. The trial judge was Mr. Justice CULLEN, later Chief Judge of this court. In his opinion in the trial court he admitted the possibility that a slight extension

of the doctrine of *Sanger* v. *Merritt* would withdraw the whole foundation of the plaintiff's claim or ownership. He pointed out, however, that as "a matter of common knowledge * * * the source of all titles in Hempstead, and in most of the Long Island towns, is found simply in town order votes or allotments." "It is now too late," he said, "after the lapse of two hundred and fifty years, to criticize, on account of absence of legal forms, transfers on which the titles of great communities are based." This comment was quoted with approval when the case came before us here. Approaching the case in that spirit, the same spirit that is reflected in the opinion of the Attorney-General a century and a half before, the court arrived at the conclusion that the allotment was sufficient to divest the title of the town. "It was not until 1787 that, by enactment in that year (Ch. 44, § 9), greater formalities were made requisite in the execution of conveyances of estates, other than at will" (p. 301). We think the problem now before us should be viewed from a like outlook. Thus approaching and weighing it, we uphold the ancient methods of conveyance by allotment, consecrated as they are by centuries of practice and tradition.

The respondents would have us hold that allotments, though entered upon the records, were ineffective as a source of title unless succeeded by possession. The burden is on them to show that possession was not taken. We cannot say upon this record that the burden was sustained. For all that appears the scrub pine and oak which is known to have been upon the land for upwards of forty years, is a second or recent growth. The plaintiff was unwilling to testify that the land had not been cleared before. Aside, however, from this lacuna in the proofs, we find no basis for a holding that possession was essential to give effect to an allotment. Much of the soil was unfit for cultivation; much, even if fit, was not needed for present use. This was true in 1782, and

even more obviously true a century before. There was no thought, we may be fairly sure, in the minds of the people of those days, in the minds of members of an unsettled and primitive community, that immediate possession would be necessary to validate a title, except, perhaps, the symbolical possession that comes from livery of seizin. Forms of alienation established by tradition must be given a significance consistent with the beliefs and expectations of those who brought them into being. We do violence to probabilities if we impute to the landowners of the seventeenth century a state of mind that would condition the validity of allotments upon acts in *pais* thereafter. Worse than this, we place in jeopardy the security of titles if we hold that title fails unless possession can be proved. The secret is hidden by the centuries. There may have been possession not visible today, by fencing or by cutting timber or by any of the uses of husbandry as practiced in those times. We shall find it hard to know. Even harder shall we find it, if there was possession of some sort, to determine the extent, to fix the bounds of occupation when monuments have been leveled by the devastating years. There can be little doubt that some at least of the proprietors who had allotments under the Quogue division did enter into possession, even though the lots so occupied are not the particular parts of the division in controversy here. The allotment was a single act, good or bad in its entirety, and proprietors who acquiesced in the possession of co-proprietors in the faith that the division was binding upon all, would be greatly wronged if it were held to be binding as to the others and void as to themselves.

What has been written has confirmation when we consider the implications of the act of 1818 and consider at the same time the occasion for its passage. One finds it difficult to believe that in the year 1818, when the trustees were empowered to sell the lands then

undivided, there was any thought by the proprietors that the premises now in controversy, or any premises allotted, were to be the subject of the sale. By the terms of the statute, the trustees were not to be chosen by the inhabitants generally, nor even by all who had once been recognized as proprietors. They were to be chosen by the proprietors of the lands then undivided, and the clerk was directed to keep a record of the names. The Legislature can hardly have expected that the allottees of the common lands, who certainly must have believed that the allotments were valid and sufficient, would cause their names to be registered as proprietors of undivided lands, and thus co-operate with the trustees in nullifying the foundations of their title. In those days many proprietors who knew the conditions that had prevailed in 1782 must still have been alive. If some further act of possession was necessary to give effect to the parol division, they were in a position to do it even then and thus confirm their ownership (*Wood* v. *Fleet*, 36 N. Y. 499). There would have been injustice as well as futility in asking them to give that privilege away.

The act of 1818 must be read in the light of these conditions, notorious to the men who framed it. The aim was not to unsettle the old allotments or the titles built upon them. The aim, on the contrary, was security and peace. What had been divided was to be untouched, if division had been made according to the ancient forms. What was undivided, and nothing else, was to be the subject of the future sales. Nothing in the statute betokens a belief that the validity of past divisions was dependent upon proof that there had been livery of seizin followed by continuous possession. The colonists who had made these allotments decades and even centuries before were well aware that immediate occupation was not to be looked for in view of the nature of the soil and the conditions of life in a pioneer community. There was no thought in 1818 to thwart their expectations.

We are rather to see in the statute a submission to the force of usage in an era when law was still unsettled, a legislative recognition of ancient forms of alienation and a confirmation of those forms as an independent source of title.

To avoid misapprehension, the fact should be here recorded that there is no evidence of occupation of the woodland for such a time or in such a manner as to establish for any of the parties an adverse possession sufficient to create a title.

The judgment of the Appellate Division and that of the referee should be reversed, and the complaint dismissed as to the appellants, with costs in all courts.

CRANE, LEHMAN, KELLOGG and O'BRIEN, JJ., concur; POUND and HUBBS, JJ., not sitting.

Judgments reversed, etc.