HERMETIC SEAL PRODUCTS COMPANY, P.R., PETITIONER, *v.* RENEGOTIA-TION BOARD, RESPONDENT

Docket Nos. 961–R, 962–R. Filed November 15, 1963.

*Jules H. Sigal*, for the petitioner.
*Irwin Goldbloom*, for the respondent.

OPINION

FAY, *Judge:* On March 27, 1957, the respondent issued its unilateral order determining that for the fiscal year ended July 31, 1952, the petitioner had received excessive profits in the amount of $250,000 upon contracts and subcontracts subject to renegotiation under the provisions of the Renegotiation Act of 1951 (50 U.S.C. secs. 1211–1233 (1952 ed.)). On the same date the respondent issued its unilateral order determining that for the fiscal year ended July 31, 1953, the petitioner had received excessive profits in the amount of $400,000 upon contracts and subcontracts subject to renegotiation under the provisions of the Renegotiation Act of 1951 (50 U.S.C. secs. 1211–1233 (1952 ed.)).

The parties have stipulated that if the petitioner is subject to the Renegotiation Act of 1951, it received excessive profits of $250,000 in fiscal year 1952 and $400,000 in fiscal year 1953. The sole issue for decision is whether the Act is applicable to the petitioner, a Puerto Rican corporation.

All of the facts are stipulated and are found as stipulated.

The petitioner is a corporation incorporated under the laws of Puerto Rico on or about May 17, 1951. At all times material to this case the petitioner had its principal office and place of business at Rio Piedras, P.R. From the time of its incorporation and during fiscal years 1952 and 1953, the petitioner was primarily engaged in the manufacture of various sizes and shapes of hermetically sealed glass-metal terminals used in the various components of electronic equipment, such as thermostats, crystals, relays, condensers, transformers, and tubes. The raw materials for the petitioner's operations were largely purchased by the petitioner from suppliers in the continental United States. Petitioner's operation was, in part, of an assembly nature and the manufacturing process included the use of acid dips and a tinning operation.

The petitioner's products were sold to numerous manufacturers of electronic equipment both for uses not subject to renegotiation and for

use under contracts and subcontracts for electronic equipment with Departments of the United States Government as defined in section 103(a) of the Renegotiation Act of 1951, as amended.

The petitioner contends that the Renegotiation Act of March 23, 1951 (65 Stat. 7, 50 U.S.C. secs. 1211–1233 (1952 ed.)), does not apply to it because it is a Puerto Rican corporation, and the act does not apply in Puerto Rico. The respondent, on the other hand, contends that the act is applicable to the petitioner. We agree with the respondent.

Section 9 of the so-called Second Organic Act for Puerto Rico of March 2, 1917 (39 Stat. 951, 954, 48 U.S.C. 734 (1946 ed.)), as amended on April 30, 1946 (60 Stat. 158), provides:

The statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Puerto Rico as in the United States, except the internal revenue laws other than those contained in [the Philippine Trade Act of 1946]: *Provided, however*, That after May 1, 1946, all taxes collected under the internal revenue laws of the United States on articles produced in Puerto Rico and transported to the United States, or consumed in the island shall be covered into the Treasury of Puerto Rico. * * *

The petitioner contends that this section extended to Puerto Rico only those Federal statutes in existence at the time of its enactment and that subsequent legislation is in force in Puerto Rico only if expressly made applicable to it. In support of this contention, the petitioner cites *Beers* v. *Hotchkiss*, 256 N.Y. 41, 175 N.E. 506, 510 (1931), in which the New York Court of Appeals said:

Only those parts of the statute law of England that formed the law of the colony at the date of the Battle of Lexington are to be held as law thereafter, and we are left to discover what those statutes were. There was no adoption en bloc of every act of Parliament, irrespective of its subject-matter or of the usage of the colony. A distinction is often drawn between the statutes of the mother country in existence at the settlement of a colony and those adopted afterwards. The first are deemed to have entered into the fabric of the common law, and, like the common law itself, became law in the colony unless unsuited to the new conditions. Reinsch, Colonial Common Law, Select Essays in Anglo-American Legal History, vol. 1, p. 390; The Lauderdale Peerage, L. R. 10 A. C. 692, 744. The second were not operative beyond the limits of the realm of England unless expressly declared to be operative abroad.

However, that court was quick to point out that the rule of applicability was subject to many exceptions, for it said at page 511:

One of the chief difficulties confronting a student of our legal history is that the whole subject of the reception of English law, both common and statutory, was not thought out in any consistent way, but was left unsettled and in the air. The plaint was a common one that "no one can tell what is law and what is not in the plantations." Sioussat, The Theory of the Extension of English Statutes to the Plantations, Select Essays in Anglo-American Legal History, vol. 1, pp. 429, 430.

In any event, we believe that after the enactment of the so-called Second Organic Act for Puerto Rico, *supra*, it was not essential to refer expressly to Puerto Rico to make a Federal statute applicable there. All that was necessary was a congressional intent that a statute apply in Puerto Rico. Such an approach was adopted by the Court of Appeals for the First Circuit in *Moreno Rios* v. *United States*, 256 F. 2d 68, 71 (C.A. 1, 1958), in which that court said:

it is clear that Congress has the power to apply the Act [Narcotic Drugs Import and Export Act] to Puerto Rico; and the only remaining question is whether Congress has intended such application.

We do not believe that Congress intended that the operation of the Renegotiation Act be limited to any particular area but rather intended that it be applied wherever goods or services were procured. The purpose of the act was to provide a method for assuring that the United States would pay no more than a reasonable price for goods and services. This result would be equally desirable whether procurement was made in the United States or elsewhere. Section 106(a)(1) of the act (65 Stat. 17, 50 U.S.C. sec. 1216(a)(1)) provides, among other exemptions, an exemption for contracts with governments of foreign countries or any agency thereof. Section 106 (d)(1) of the act (65 Stat. 17, 50 U.S.C. sec. 1216(d)(1)) authorizes the Renegotiation Board to exempt "any contract or subcontract to be performed outside of the territorial limits of the continental United States or in Alaska." Finally, section 104 of the act (65 Stat. 11, 50 U.S.C. sec. 1214) requires that the Secretary of each Department of the United States Government, the contracts of which are subject to the act, insert in contracts made 30 days or more after the enactment of the act a provision that the contractor agrees to the elimination of excessive profits and will insert a similar provision in all subcontracts. This provision contains no exception based on the place where the contract or subcontract is to be performed. All of these things taken together clearly demonstrate that Congress intended the act to be applicable without limitation to any particular place.

The petitioner, however, contends that the Renegotiation Act of 1951 is a statute that is "locally inapplicable" within the meaning of that term as used in section 9 of the so-called Second Organic Act for Puerto Rico, *supra*, because it unduly interferes with the powers of self-government granted to Puerto Rico. We cannot agree that this is so. The Renegotiation Act of 1951 would operate in Puerto Rico in the same way as it would in the States of the Union. See *Dario Sanchez* v. *United States*, 256 F. 2d 73 (C.A. 1, 1958); and *Carrion* v. *Gonzales*, 125 F. Supp. 819 (D. P.R. 1954).

Nor can we agree with the petitioner that the act is inapplicable in Puerto Rico because it is an "internal revenue" law. The purpose

of the act is not the raising of revenue, but rather the conservation of funds otherwise raised through assuring judicious purchasing.

Finally, the petitioner contends that the act is not applicable to it because of an exception to the act provided in the regulations of the Renegotiation Board. By regulations found in 17 Fed. Reg. 2539 (1952), 32 C.F.R. sec. 1455.2(b)(1) (1952 ed.), the Renegotiation Board excepted from the operation of the Act contracts where:

(i) performance and delivery are to be effected outside the United States, its territories and possessions, and (ii) the prime contractor or subcontractor is a foreign corporation or a foreign national, or is a partnership or joint venture, all of the members of which are foreign corporations or foreign nationals.

We do not believe that this exemption is applicable to the petitioner. In our view the petitioner, a Puerto Rican corporation, cannot be considered a "foreign corporation" within the meaning of the regulations. See *Gonzales* v. *Williams*, 192 U.S. 1 (1903); and *Ponce* v. *Roman Catholic Church*, 210 U.S. 296, 309 (1908). Furthermore, the petitioner has the burden of proof, *Aircraft Screw Products Co.*, 8 T.C. 1037, 1044 (1947). There is nothing in the record from which we could determine where performance and delivery were effected under the petitioner's contracts.

*Decisions will be entered for the respondent.*